**HIGH VOLTAGE ENGINEERING CORPORATION, Plaintiff, Appellant,**

v.

**FEDERAL INSURANCE COMPANY, Defendant, Appellee.**

No. 92–1588.

United States Court of Appeals, First Circuit.

Heard Oct. 7, 1992.

Decided Dec. 16, 1992.

---

William G. Southard, with whom Sarah B. Porter and Bingham, Dana & Gould, Boston, MA, were on brief, for plaintiff, appellant.

Peter G. Hermes, with whom Mark E. Young and Peabody & Arnold, Boston, MA, were on brief for defendant, appellee.

Before CYR, Circuit Judge, BOWNES, Senior Circuit Judge, and FUSTÉ,* District Judge.

CYR, Circuit Judge.

Appellant High Voltage Engineering Corporation ("High Voltage") instituted this diversity action in the United States

District Court for the District of Massachusetts against Federal Insurance Company ("Federal") demanding reimbursement of costs incurred in defending and indemnifying certain of its officers and directors in an underlying state court action. The district court granted summary judgment for Federal, on the ground that insurance coverage was excluded under the pollution exclusion clause. We affirm.

# I

## BACKGROUND

### A. The Underlying State Court Action

On September 14, 1983, American Landmark Development, Inc. ("Landmark") agreed to buy thirty-four acres of commercial real estate in Burlington, Massachusetts ("Burlington site") from High Voltage. Landmark assigned its purchase rights to Oskar Brecher and Bruce Silverman, d/b/a American Landmark Partners and American Landmark Partners II ("ALP"). On March 27, 1984, ALP purchased the Burlington site from High Voltage and leased back the portion on which High Voltage was to continue its manufacturing operation.

At the time of the sale, the Chief Executive Officer of High Voltage assured ALP that the Burlington site had not been contaminated by hazardous waste during the preceding fifteen years. Three years later, in March 1987, hazardous materials were discovered in the soil, groundwater, and bedrock at the Burlington site. The contaminants were most conspicuous near a degreaser unit operated by High Voltage. The cleaning solvents utilized in the High Voltage degreaser unit were identical to the contaminants found in the surrounding area. ALP notified High Voltage and attempted to arrive at a settlement on the cleanup costs.

In December 1987, High Voltage became the target of a hostile tender offer by Natalie Acquisition Corporation ("Natalie"), a subsidiary of Hyde Park Partners, a limited partnership controlled by Clifford

* Of the District of Puerto Rico, sitting by designation.

Press and Laurence Levy. Natalie borrowed $51 million from Marine Midland National Bank ("Marine Midland") to finance Natalie's acquisition of High Voltage's stock. By March 1988, Natalie had acquired 94% of High Voltage's stock, and Press and Levy became officers and directors of High Voltage. In August 1988, Press and Levy merged Natalie into High Voltage, and High Voltage assumed liability for the Marine Midland loans with which the High Voltage takeover had been financed.

Meantime, ALP met with little success in persuading High Voltage to clean up the hazardous wastes at the Burlington site. In February 1988, ALP again demanded that High Voltage accept responsibility for the cleanup. In March 1988, ALP threatened legal action unless High Voltage cleaned up the contamination and compensated ALP in damages. Ultimately, in September 1988, ALP brought an action in Massachusetts Superior Court demanding declaratory, injunctive, and monetary relief from High Voltage, Press, and Levy, among others.

### B. *The Present Dispute*

In October 1987, prior to Natalie's takeover of High Voltage but after the discovery of the contaminants at the Burlington site, Federal issued an executive liability and indemnity policy to High Voltage, insuring High Voltage's officers and directors against loss occasioned by third party claims for wrongful acts committed during the policy period. High Voltage itself was insured under the policy for defending or indemnifying its officers and directors against third party claims. The coverage exclusions in the Federal policy included the pollution exclusion clause at issue in the present dispute and a property damage exclusion clause.

In April 1988, High Voltage notified Federal of ALP's threats to initiate legal action, and in October 1988 provided Federal with a copy of the ALP complaint. Federal declined coverage, citing the pollution and property damage exclusions.

High Voltage initiated the present diversity action, seeking a judicial declaration that Federal was liable under the policy for losses incurred by High Voltage and its officers and directors in connection with the ALP action, damages for breach of contract, and damages for unfair and deceptive business practices under Mass. Gen.L. ch. 93A. Subsequently, High Voltage dropped all demands for relief, except its claim for damages incurred in behalf of Press and Levy in connection with count XIV of the ALP complaint alleging unfair and deceptive trade practices under Mass. Gen.L. ch. 93A. Federal moved for summary judgment under the pollution and property damage exclusion clauses. High Voltage countered with a motion for partial summary judgment relating to the same issues. Finding "no relevant ambiguity in the [p]olicy, or uncertainty in the facts, which would justify denying effect to the [p]olicy's pollution exclusion," the district court concluded that the High Voltage claims "clearly lie outside the [p]olicy's coverage under the circumstances in this case." On appeal, High Voltage challenges the grant of summary judgment.

## II

## DISCUSSION

■ "We review *de novo* to ensure that no genuine issue of material fact ... has been overlooked and that ... [the moving party was] entitled to summary judgment as a matter of law." *Jimenez v. Peninsular & Oriental Steam Navigation Co.*, 974 F.2d 221, 222 (1st Cir.1992) (citing *Milton v. Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir.1992)). The proper interpretation of an insurance policy presents a question of law. *Nieves v. Intercontinental Life Ins. Co. of Puerto Rico*, 964 F.2d 60, 63 (1st Cir.1992); *see also Atlas Pallet, Inc. v. Gallagher*, 725 F.2d 131, 134 (1st Cir.1984). As the findings of fact material to the present appeal are undisputed, we need only determine whether Federal is entitled to judgment as a matter of law.

■ The ALP complaint in the underlying state court action comprises seventeen

counts against numerous defendants and alleges violations of the Massachusetts Oil and Hazardous Material Release Prevention Act, breach of warranty, breach of lease, deceit, trespass, and negligence. The relief ALP sought included: an injunction directing defendants to assess, contain, and remove hazardous waste contamination at the Burlington site and to cease and desist from further releases of contaminants; damages caused by the contamination; damages resulting from High Voltage's unfair and deceptive practices, including its alleged misrepresentation and concealment and its failure to clean up the contamination; damages for breach of its warranty relating to the absence of site contamination; the annulment, as a fraudulent conveyance, of High Voltage's agreement to satisfy Marine Midland's loans to Natalie, the proceeds from which were used to buy High Voltage stock; annulment of the High Voltage security agreement with Marine Midland, granting security interests and mortgages in all High Voltage assets, which allegedly rendered High Voltage insolvent and placed its assets beyond ALP's reach; and an injunction against the liquidation of High Voltage's assets and the conveyance of any additional assets to Marine Midland.

The controversy on appeal focuses on count XIV of ALP's complaint in the underlying state court action. Count XIV names Press, Levy, and Hyde Park Partners as defendants and charges unfair and deceptive trade practices in violation of Mass. Gen.L. ch. 93A. The relevant substantive allegations in count XIV are as follows:

161. On information and belief, Press and Levy, on behalf of Hyde Park Partners, control the affairs of High Voltage and have for their own personal benefit intentionally stalled the Plaintiffs in order to consummate the merger, document High Voltage's obligation and collateral to Marine Midland, and liquidate assets of High Voltage without making them available to the Plaintiffs.

162. On information and belief, Press, Levy and Hyde Park Partners have exerted their control over High Voltage to cause High Voltage to take minimal action in regards to the contamination problem; have delayed the progress by firing engineers previously retained by them and by limiting the efforts of the engineers currently retained by High Voltage; and have knowingly injured the Plaintiffs, for the personal gain of Press, Levy and Hyde Park Partners.

. . . .

166. Press, Levy and Hyde Park Partners, in their conduct towards the Plaintiffs, have employed unfair and deceptive acts and practices against the Plaintiffs, primarily and substantially in the Commonwealth of Massachusetts in the conduct of a trade or commerce, each and every one of which is a separate and distinct cause of action, including, but not necessarily limited to the following:

a. By using their control over the affairs of High Voltage to attempt to sabotage the Plaintiffs' development of the [Burlington site].

b. By deceiving and stalling the Plaintiffs for their own personal gain.

c. By attempting to use economic duress against the Plaintiffs to force them to abandon their claim against High Voltage, and to enable High Voltage to attempt to liquidate the Plaintiffs' promissory note to High Voltage.

d. By using their control over High Voltage to cause High Voltage to continue to fail to remove said contamination from [the Burlington site].

e. By using their control over High Voltage to cause High Voltage to fraudulently convey its assets to Marine Midland.

f. By using their control over High Voltage to interfere with the contractual relations between the Plaintiffs and High Voltage, and to cause High Voltage to breach its contracts with and other obligations to the Plaintiffs.

g. By causing High Voltage to negotiate with the Plaintiffs in bad faith as aforesaid in order to stall the Plaintiffs from pursuing their rights against High Voltage.

h. By causing High Voltage to act in a manner designed to continue to

injure the Plaintiffs, to continue to frustrate the Plaintiffs in their efforts to remove the hazardous materials from the [Burlington site], to place the Plaintiffs in a position of economic duress.

    i. By causing High Voltage to breach its obligation of good faith and fair dealing.

The pollution exclusion clause in the Federal insurance policy provides:

> [Federal] shall not be liable under this policy to make any payment for Loss in connection with any claim(s) made against any Insured Person(s) ... (D) where *all or part* of such claim is, *directly or indirectly*, based on, attributable to, arising out of, resulting from or *in any manner related to the Insured's Wrongful Act(s) concerning:*
>
>     (1) *the* actual, *alleged* or threatened *discharge, release or escape of Pollutants* into or on real or personal property, water or the atmosphere.
>
>     (2) *any Loss or expense arising out of any direction or request that the Insured* test for, monitor, *clean up, remove, contain, treat, detoxify or neutralize Pollutants.*[1]

(Emphasis added.) The policy defines "Loss" as "the total amount which any Insured Person(s) becomes legally obligated to pay on account of each claim and for all claims in each Policy Year made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments, settlements, costs and Defense Costs." A "Wrongful Act" is "any error, misstatement, misleading statement, act, omission, neglect, or breach of duty committed, attempted, or allegedly committed or attempted, by any Insured Person, individually or otherwise, in his Insured Capacity, or any matter claimed against him solely by reason of his serving in such Insured Capacity."

    ■ The parties agree that Massachusetts law applies. *See Mathewson Corp. v.*

*Allied Marine Indus., Inc.*, 827 F.2d 850, 853 n. 3 (1st Cir.1987) (accepting parties' "expressed preference" for the application of Massachusetts law). Under Massachusetts law, "[t]he first approach to the question of interpretation must be to read [the] policy as one would read any ordinary contract—to inquire what the simplified, conversational language of the policy would mean to a reader applying normal reasoning or analysis." *Commerce Ins. Co. v. Koch*, 25 Mass.App.Ct. 383, 384, 522 N.E.2d 979, 980 (1988). *See also Nelson v. Cambridge Mut. Fire Ins. Co.*, 30 Mass. App.Ct. 671, 673, 572 N.E.2d 594, 596 (1991). "A policy of insurance whose provisions are plainly and definitely expressed in appropriate language must be enforced in accordance with its terms." *Stankus v. New York Life Ins. Co.*, 312 Mass. 366, 369, 44 N.E.2d 687, 689 (1942); *see Cody v. Connecticut Gen. Life Ins. Co.*, 387 Mass. 142, 146, 439 N.E.2d 234, 237 (1982); *Nelson*, 30 Mass.App.Ct. at 673, 572 N.E.2d at 596. But "where language in an insurance policy is found to be ambiguous, 'doubts as to the intended meaning of the words must be resolved against the insurance company that employed them and in favor of the insured.'" *Id.* (quoting *August A. Busch & Co. v. Liberty Mut. Ins. Co.*, 339 Mass. 239, 243, 158 N.E.2d 351, 353 (1959)). Coverage exclusions are to be strictly construed and any ambiguity is to be interpreted in favor of the insured. *Andover Newton Theological School, Inc. v. Continental Cas. Co.*, 930 F.2d 89, 93 (1st Cir.1991) (applying Massachusetts law).

The district court ruled that

> [c]ount XIV of the underlying complaint clearly alleges claims which are *"directly or indirectly,* based on, attributable to, arising out of, resulting from or *in any manner related to* [Press and Levy's] *'Wrongful Act(s)' concerning* the actual, alleged or threatened discharge, release or escape of 'pollutants' into or on real or personal property, water or the atmosphere." ... The unfair and deceptive

---

**1.** The policy identifies terms defined elsewhere in the instrument with capital letters and bold type in some places and capital letters and quotation marks in others. To minimize confusion, we retain the capital letters in direct quotes from the policy, but dispense with the bold type and quotation marks.

acts alleged in count XIV constitute Wrongful Acts under ¶ 9.1 of the Policy, which in context clearly relate to the pollution of the site.

(Emphasis added.) The crux of the High Voltage claim on appeal is that count XIV of the ALP complaint alleges certain "wrongful acts" by Press and Levy that do not "concern" the release of pollutants, and therefore are not excluded from coverage by the pollution exclusion clause. High Voltage specifically cites, as examples, the allegations that Press and Levy stalled ALP's pursuit of its claim against High Voltage in order to liquidate High Voltage assets for their personal gain, fraudulently conveyed High Voltage assets, frustrated ALP's real estate development efforts, and sought to compel ALP to abandon its claim against High Voltage. As each is delineated a "separate and distinct cause of action," High Voltage urges that the claims alleged in ¶ 166 of the ALP complaint, *see supra* pp. 599–600, are independent of all pollution-related claims, hence not within the purview of the pollution exclusion clause. In order to ascertain whether the pollution exclusion applies to the claims in count XIV for which High Voltage seeks reimbursement from Federal, we must determine whether "all or part of" the claims are "in any manner related" to "wrongful acts" [2] of Press and Levy concerning either the release of pollutants or "any Loss or expense arising out of any direction or request that the Insured test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants."

As High Voltage views the matter, neither the complaint's primary focus on pollution-related claims, nor its inclusion of non-contamination claims traceable to the alleged contamination, triggers the pollution exclusion clause. As we see it, however, there could be no legally cognizable claim against Press or Levy in the underlying state court action, *but for* the alleged "wrongful acts" indisputably related to pollution.

Contrary to High Voltage's contention that the pollution exclusion clause is only implicated if a claim expressly alleges a release of pollutants "participated in, authorized, or approved" by the insured, its unambiguous language excludes from coverage any claim *"all or part* of [which] is, *directly or indirectly,* based on, attributable to, arising out of, resulting from or *in any manner related to the Insured's Wrongful Act(s) concerning"* a release of pollutants. (Emphasis added.) Under the construction urged by High Voltage, the unambiguously expansive language of the pollution exclusion clause would be rendered superfluous. *See, e.g., Edmund Wright Ginsberg Corp. v. C.D. Kepner Leather Co.,* 317 Mass. 581, 587, 59 N.E.2d 253 (1945) ("It is a general rule in the construction of contracts that whenever practicable every word shall be given some effect."). We decline to adopt the gratuitous interpretation urged by High Voltage, as the unambiguous pollution exclusion clause plainly requires no direct relationship between the claim and the alleged "wrongful act;" a claim "indirectly" related to the "wrongful act," "in whole or in part" and "in any manner," is excluded from coverage.

High Voltage concedes that the "general theme" of the complaint is the existence of contamination at the Burlington site and that "aspects" of count XIV—specifically, the allegations that Press and Levy prevented High Voltage from removing the contamination and frustrated ALP's efforts to remove the contamination—concern pollution. In our view, these allegations form the core of ALP's claim against Press and Levy. The remaining claims in count XIV either restate these allegations or specify particular actions allegedly undertaken by Press and Levy in order to prevent removal of the contamination. For example, the allegations that Press and Levy stalled ALP in order to consummate the merger and liquidate High Voltage's assets, fraudulently conveyed High Voltage's assets, and sought to compel ALP to abandon its claim, merely detail the methods allegedly used by Press and Levy to impede removal of the contamination. The allegation that

---

**2.** The policy definition of "wrongful act" includes acts "allegedly committed or attempted."

Press and Levy frustrated ALP's real estate development efforts particularizes a direct effect of their alleged efforts to prevent removal of the contamination. The allegation that Press and Levy caused High Voltage to breach its contractual and other obligations to the plaintiffs essentially restates the allegation that they impeded removal of the contamination, as the complaint nowhere mentions obligations breached by High Voltage that were unrelated to the purported obligation to clean up the Burlington site.

Thus, we cannot conclude that the "wrongful acts" of Press and Levy concerning the release of pollutants alleged elsewhere in the complaint are entirely unrelated to the claims in count XIV for which High Voltage seeks recovery.[3] Clearly, "all or part of" these claims are "directly or indirectly, based on, attributable to, arising out of, resulting from or in [some] manner" related to alleged "wrongful acts" of Press and Levy concerning the release of pollutants and expenses arising from ALP's request that High Voltage clean up the Burlington site. Accordingly, these claims are excluded from coverage by the plain language of the pollution exclusion.

As Federal was entitled to judgment as a matter of law, the district court judgment must be affirmed.[4]

*Affirmed.*

---

**3.** Furthermore, many of these claims are related to "wrongful acts" of Press and Levy concerning expenses arising out of a "direction or request" for the removal of pollutants within the meaning of subsection (2) of the pollution exclusion, in that they allege attempts by Press and Levy to divert High Voltage assets that otherwise would have been available to clean up the Burlington site. The fraudulent conveyance claim, for example, is clearly "related" to alleged "wrongful acts" of Press and Levy concerning expenses arising out of ALP's request that High Voltage clean up the Burlington site. Had ALP made no such request, it would have lacked standing to bring the count XIV fraudulent conveyance claim against High Voltage.

**4.** High Voltage contends that it is entitled to recover the legal defense costs it incurred in behalf of Press and Levy, regardless of its entitlement to indemnification costs, because the allegations in the ALP complaint are reasonably interpreted as stating a claim covered under the terms of the policy. In light of our holding that the plain language of the pollution clause excluded coverage for "Loss" (including defense costs) incurred by High Voltage in behalf of Press and Levy, High Voltage's claim for reimbursement of its defense costs is precluded by the pollution exclusion clause. Thus, we do not reach the Federal defense based on the property damage exclusion.