DANIS, Appellee,

v.

GREAT AMERICAN INSURANCE COMPANY, Appellant.

Diversified Environmental Management Company
et al., Appellees and Cross–Appellants,

v.

Great American Insurance Company, Appellant and Cross–Appellee.

[Cite as *Danis v. Great Am. Ins. Co.,* 159 Ohio App.3d 119, 2004-Ohio-6222.]

Court of Appeals of Ohio,
Second District, Montgomery County.

Nos. 20236 and 20237.

Decided Nov. 19, 2004.

120

Ronald J. Kozar; Jenner & Block, L.L.C., John H. Mathias Jr., David M. Kroeger, and Margaret Simpson, for appellee and cross-appellant John S. Danis.

Peter F. Lovato, Ellen D. Jenkins, and Paul H. Shaneyfelt, for appellant and cross-appellee, Great American Insurance Company.

Paul A. Rose, Clair E. Dickinson, and Kevin Drummond Eiber, for appellees and cross-appellants Diversified Environment Management Company et al.

———————

BROGAN, Judge.

{¶ 1} This case is before us on the appeal of Great American Insurance Company from a trial court decision awarding partial summary judgment on an insurance coverage issue. From November 18, 1999, through November 18, 2000, Great American insured numerous Danis entities, officers, and directors under a policy designated "Exec. Pro$^{SM}$ Directors', Officers', Insured Entity and Employment Practices Liability Policy number DOL8811277." The policy was a claims-made policy, with an aggregate liability limit (including costs of defense) of $10,000,000. Insured parties included the following companies and individuals: Diversified Environmental Management Company ("DEMCO"), the Danis Companies ("TDC"), Danis Environmental Industries, Inc. ("DEII"), Danis Building Construction Company ("DBBC"), Thomas J. Danis, John S. Danis, Gregory L. McCann, and Richard Russell (at times collectively referred to as either "Danis" or "the Danis defendants"). At issue in the trial court was whether Great American was required to advance defense costs for the Danis defendants in connection with litigation pending in the United States District Court for the Southern District of Ohio, Western Division (*Waste Mgt., Inc. v. Danis Industries Corp.*, 257 F.Supp.2d 1076).

{¶ 2} The pertinent history of the federal case goes back many years, to 1983, when a predecessor of Waste Management, Inc. and Waste Management of Ohio (collectively, "WM") purchased all the outstanding shares of certain companies from Danis Industries Corporation ("DIC"). A subsidiary of one of these companies leased and operated a landfill known as Valleycrest. In connection with the stock purchase, DIC agreed to indemnify WM against certain liabilities, including ownership of any landfill. However, the indemnification agreement was not limited to environmental liabilities.

{¶ 3} After the 1983 sale, the Danis companies underwent various reorganizations and restructuring. In 1988, TDC was formed as a holding company, and DIC became a wholly owned subsidiary of TDC. Subsequently, DEMCO was formed in 1990 as another wholly owned subsidiary of TDC. Other TDC subsidiaries were created in 1992, including DBBC and Danis Heavy Construction Company (later changed to Danis Environmental Industries, or DEII). DBBC was a commercial construction company that specialized in constructing large office buildings.

{¶ 4} In December 1992, the Ohio Environmental Protection Agency ("OEPA") issued information requests to WM and DIC under the Comprehensive Environ-

mental Response, Compensation, and Liability Act ("CERCLA"), Section 9604(e), Title 42, U.S.Code. OEPA subsequently notified WM and DIC that they were liable as "potentially responsible parties" ("PRPs") for certain response costs needed to remediate and clean up the release or threatened release of hazardous substances from Valleycrest.

{¶ 5} WM demanded indemnification for the response costs, but DIC refused. Litigation then ensued in federal court and was settled in December 1997 with execution of a settlement agreement. In the settlement, DIC agreed to indemnify WM for "covered claims," which were defined to include claims arising from, or in any way related to, Valleycrest, including claims for environmental pollution, remediation, failure to remediate, toxic torts, bodily injury, and property damage.

{¶ 6} Shortly before DIC and WM executed the 1997 settlement agreement, TDC underwent a major corporate restructuring, also referred to by the parties as a "recapitalization/split-off" transaction. In this process, DBBC was separated from DIC and TDC, and compensation was paid to TDC stockholders. For example, John Danis received 73 percent of the shares in DBBC in exchange for his interest in TDC. Other Danis shareholders received 27 percent of the DBBC shares, plus $26,500,000 in cash for their interest in TDC.

{¶ 7} According to the allegations in federal court, DBBC was a profitable subsidiary, and the split was designed to insulate DBBC from existing and future environmental liabilities to WM. In addition, WM claimed that the recapitalization/split-off stripped DIC and TDC of assets, leaving them without sufficient funds to satisfy their indemnification obligations to WM.

{¶ 8} In connection with the pollution issue, DIC and WM also entered into agreements with other parties, including the United States Environmental Protection Agency. These agreements involved remediating Valleycrest and allocating costs. The agreements included a First Amended Site Preparation Agreement ("SPA") and a Government Entity Participation Agreement ("GEPA"). In May 1998, DIC and WM signed a site-preparation agreement for the Valleycrest landfill, in which they agreed to be responsible for about 46 percent of the cleanup costs. Due to this agreement and DIC's existing indemnification agreement with WM, DIC would have been responsible for WM's share of the 46 percent of cleanup costs.

{¶ 9} Apparently, nothing more of note occurred until December 1999, when WM was named as a defendant in a state court action. In that case (the Pitts litigation), the plaintiffs claimed to have been injured as a result of exposure to alleged toxic materials at Valleycrest. Believing that the Pitts claim was a "covered claim" under the 1997 settlement agreement, WM demanded that DIC defend the action and hold WM harmless for the claim. Although DIC initially

acknowledged its obligations, DIC later told WM that it did not have enough resources to satisfy its obligations for Pitts and the CERCLA response costs.

{¶ 10} Consequently, in May 2000, WM filed a complaint in federal court against DIC, TDC, the Danis Environmental Management Group, John Danis, and various John Does. A first amended complaint was then filed in October 2000, adding McCann, Thomas Danis, Russell, DEMCO, DBBC, and DEII. Counts one through four and six of the amended complaint were directed at DIC and alleged breaches of the 1997 settlement agreement, the SPA, and the GEPA. In addition, WM asked for a declaratory judgment of DIC's and WM's rights and obligations under the settlement agreement, the SPA, and the GEPA. WM also asked for contribution of response costs under CERCLA.

{¶ 11} Count five of the federal complaint was directed at the Danis shareholders. In this count, WM claimed that the shareholders were personally obligated for the settlement agreement because of the undercapitalization of TDC and DIC. WM further alleged in this count that DEMCO, DEI, DBBC, and TDC were responsible for the damages based on alter ego and successor liability theories.

{¶ 12} Finally, counts seven though twelve of the federal complaint alleged a variety of tort claims against the director and officer defendants, including fraud and constructive fraud concerning the 1997 settlement agreement, the SPA, and the GEPA. Additional claims involved negligent misrepresentation regarding the SPA and the GEPA, fraudulent conveyance, conveyance to hinder, delay, or defraud creditors, and civil conspiracy.

{¶ 13} After Great American denied coverage and refused to advance costs for the WM lawsuit, DEMCO, TDC, DEII, DBBC, McCann, Russell, and Thomas Danis filed a complaint for breach of contract and declaratory judgment against Great American. John Danis also filed a separate complaint against Great American, and the two lawsuits were consolidated. Subsequently, all plaintiffs filed motions for partial summary judgment on the issue of Great American's duty to advance defense costs. Great American then filed a cross-motion for summary judgment, asking the court to find that it had no obligation for the WM claim due to the policy's absolute pollution exclusion.

{¶ 14} The trial court granted plaintiffs' partial motions for summary judgment and overruled Great American's motion for summary judgment. In particular, the court found that the claims were not brought against plaintiffs because of any pollution but because of their independent and intervening acts in allegedly wrongful business transactions. The court also found part of the exclusion clause ambiguous because it was too broad and expansive.

{¶ 15} Great American timely appeals from this decision and raises a single assignment of error:

{¶ 16} "The trial court erred by granting Appellees' motions for partial summary judgment and by overruling, in part, Appellant's cross-motions for summary judgment because the Pollution Exclusion in the subject insurance policy excludes coverage for all Loss, including Costs of Defense, incurred by Appellees in the underlying action."

{¶ 17} The Danis parties also filed cross-appeals, even though they prevailed in the trial court. Their appeal focuses on comments the trial court made when it overruled Great American's motion for summary judgment. Specifically, the court said in passing that the pollution exclusion would apply to prevent indemnification if plaintiffs had to ultimately pay WM damages that "arise out of, are based on, related to, involve or are a consequence of pollution." Due to concern over the possible binding effect of those remarks, DEMCO, TDC, DEII, DBBC, McCann, Russell, and Thomas Danis assert the following assignments of error:

{¶ 18} "I. The trial court erred when it stated that 'The pollution exclusion is applicable to prevent indemnification' or in rendering any opinion regarding the duty to indemnify in light of its determination that issues of fact remained that precluded summary judgment on the issue of the duty to indemnify and its decision to stay ruling on the issue of the duty to indemnify. (October 24, 2003, Decision Sustaining Plaintiff's Motion for Partial Summary Judgment, p. 14).

{¶ 19} "II. The trial court erred when it stated that 'If the Plaintiffs are found liable in the Waste Management action for claims that are not covered by the Great American policy, then the Plaintiffs will be required pursuant to the Great American policy, to repay the Defendant for the costs of defense for those claims.' (October 24, 2003, Decision Sustaining Plaintiff's Motion for Partial Summary Judgment, p. 15)."

{¶ 20} John Danis also filed a cross-appeal because of concern over the effect of the trial court's remarks. Danis now raises the following cross-assignments of error:

{¶ 21} "I. The trial court erred in determining that the pollution exclusion may apply to prevent indemnification of damages.

{¶ 22} "II. The trial court erred in stating that costs of defense must be repaid if Mr. Danis is found liable for noncovered claims."

{¶ 23} After considering the record and applicable law, we find that Great American's assignment of error has merit. Accordingly, the judgment of the trial court will be reversed.

I

{¶ 24} Great American's single assignment of error is based on a pollution-exclusion clause that allegedly precludes coverage for the federal claims. In view

of this exclusion, Great American contends that the trial court erred in granting summary judgment in favor of Danis.

{¶ 25} We review summary judgment decisions de novo, which means that "we apply the standards used by the trial court." *Brinkman v. Doughty* (2000), 140 Ohio App.3d 494, 497, 748 N.E.2d 116. See, also, *Andersen v. Highland House Co.* (2001), 93 Ohio St.3d 547, 548, 757 N.E.2d 329. Summary judgment is appropriately granted where the trial court finds "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46.

{¶ 26} According to the trial court, the underlying federal claims revolved around allegations that Danis structured the 1997 reorganization to escape its liabilities. The court, therefore, felt that an exclusion for pollution-related claims would not apply. To decide this issue, we must first look at the content of the insurance policy. In Section I.A. of the policy, Great American agreed to pay the following:

{¶ 27} "On behalf of the Insured Persons all Loss which the Insured Persons shall be legally obligated to pay as a result of a Claim (including an Employment Practices Claim or a Securities Claim) first made against the Insured Persons during the Policy Period or the Discovery Period for a Wrongful Act, except for any Loss which the Company actually pays as indemnification." (Boldface omitted.)

{¶ 28} Section I.B. of the policy further states:

{¶ 29} "The Insurer shall pay on behalf of the Company all Loss which the Insured Persons shall be legally obligated to pay as a result of a Claim (including an Employment Practices Claim or a Securities Claim) first made against the Insured Persons during the Policy Period or the Discovery Period for a Wrongful Act, but only to the extent the Company is required or permitted by law to indemnify the Insured Persons." (Boldface omitted.)

{¶ 30} "Insured Persons" are defined by the policy as "Directors and Officers and all past, present and future employees of the company other than Directors and Officers." The "Company" is defined as "the Corporation and any Subsidiary." (Boldface omitted.)

{¶ 31} There is no dispute that all appellees are insureds under the policy, either as "insured persons" or as Danis companies. In Section VII, the policy

provides that the insureds have the duty to defend all claims. However, Section VII also states:

{¶ 32} "The Insurer shall advance Costs of Defense prior to the final disposition of any Claim, provided such Claim is covered by this Policy. Any advancement shall be on the condition that:

{¶ 33} "* * *

{¶ 34} "(4) in the event it is finally established that the Insurer has no liability under the Policy for such Claim, the Company and Insured Persons will repay the Insurer upon demand all Costs of Defense advanced by virtue of this provision." (Boldface omitted.)

{¶ 35} Under the policy, a "claim" is "(1) a written demand for monetary or non-monetary relief made against any Insured * * * or (2) a civil, criminal, administrative or arbitration proceeding made against any Insured seeking monetary or non-monetary relief and commenced by the service of a complaint or similar pleading." "Loss" is defined as "compensatory damages, settlements and Costs of Defense." And finally, "Costs of Defense" are defined as "reasonable and necessary legal fees, costs and expenses incurred in the investigation, defense or appeal of any Claim including the costs of an appeal bond, attachment bond or similar bond." (Boldface omitted.)

{¶ 36} Absent an applicable exclusion, the federal claims would be covered by the policy, and Great American would be required to advance the costs of defense. However, Section IV of the policy does contain various exclusions. As pertinent to the present case, Section IV states:

{¶ 37} "The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against any Insured:

{¶ 38} "* * *

{¶ 39} "L. based upon, arising out of, relating to, directly or indirectly resulting from in consequence of, or in any way involving actual or alleged seepage, pollution, radiation, emission or contamination of any kind; provided, however, that this exclusion shall not apply to any derivative suit by a security holder of the Company if the security holder bringing such Claim is acting totally independent of and without the solicitation, assistance, active participation or intervention of any Director or Officer of the Company." (Boldface omitted.)

{¶ 40} In finding the pollution exclusion inapplicable, the trial court relied on the analysis used in *Kish v. Cent. Natl. Ins. Group of Omaha* (1981), 67 Ohio St.2d 41, 21 O.O.3d 26, 424 N.E.2d 288, and *Owens Corning v. Natl. Union Fire Ins. Co.* (Oct. 13, 1998), 6th Cir. No. 97–3367, 1998 WL 774109. In *Kish,* a driver was struck from behind while at a traffic light and left his car to confer with the

other driver. Before he could get back to his car, he was fatally shot by the driver of the other car. 67 Ohio St.2d at 42, 21 O.O.3d 26, 424 N.E.2d 288. After the decedent's insurance carriers rejected claims for uninsured-motorist coverage, the decedent's wife filed a lawsuit, arguing that coverage should exist because the accident set a chain of events in motion, but for which the decedent would still be alive. Id. at 50, 21 O.O.3d 26, 424 N.E.2d 288. However, the Ohio Supreme Court disagreed, stating:

{¶ 41} "A 'but for' analysis is inappropriate to determine whether recovery should be allowed under uninsured motorist provisions of the Nationwide policy and the Central policy. The relevant inquiry is whether the chain of events resulting in the accident was unbroken by the intervention of any event unrelated to the use of the vehicle. The application of this standard to the instant facts leads us to conclude that the intentional, criminal act of the murderer was an intervening cause of injury unrelated to the use of the vehicle. As the court below stated, 'the death resulted from an act wholly disassociated from and independent of the use of the vehicle as such.'" Id.

{¶ 42} Subsequently, in *Owens Corning,* the Sixth Circuit Court of Appeals considered whether coverage existed under a directors' and officers' policy for claims arising from the settlement of a class action suit brought by Owens Corning shareholders. 1998 WL 774109, at * 1. The shareholders brought suit against the corporation and several directors and officers following a temporary, but sharp, decline in stock prices. Misrepresentations by the directors about the company's exposure for asbestos claims allegedly inflated stock prices. Prices then fell following revelations about inadequacies of the corporation's insurance coverage for such claims. Id. at * 1–2.

{¶ 43} National Union denied coverage based on an asbestos-claims exclusion that is generally similar to Great American's pollution exclusion, i.e., the policy provided that coverage would be precluded for claims "based upon[,] arising out of or related to" asbestos. Id., 1998 WL 774109 at * 2. Despite this exclusion, the Sixth Circuit found that coverage existed. The Sixth Circuit first concluded that the shareholders' claim was not "based on" the use of asbestos. Next, the court noted that under Ohio law, the term "arising out of" required more than a "but for" analysis. Id. at * 4, citing *Kish.* In this regard, the Sixth Circuit relied on the standard set out in *Kish* and the later case of *Lattanzi v. Travelers Ins. Co.* (1995), 72 Ohio St.3d 350, 650 N.E.2d 430. In this regard, the Sixth Circuit stressed the required casual link:

{¶ 44} "[T]he alleged misrepresentations by the directors and officers broke the chain of causation linking the [underlying] claim to asbestos. In other words, the use of asbestos is not causally related to the harm alleged in the [underlying] complaint. The complaint alleges that the named directors and officers were

responsible for filing misleading financial-disclosure statements, resulting in an artificially inflated stock price. Only the alleged misrepresentations can be considered the cause of the artificially inflated prices. This is unchanged by the possibility that the motive behind the alleged misrepresentations was to hide the fact that the company was suffering financially from asbestos litigation. Thus, any negligence or wrongful act by the directors and officers with regard to the use of asbestos is irrelevant here." Id., 1998 WL 774109 at * 5.

{¶ 45} Finally, the Sixth Circuit refused to give effect to the words "related to," because "any lawsuit against the company could arguably be said to 'relate to' asbestos." Id. at * 6.

{¶ 46} Great American contends that the intervening-act approach in *Kish* is inapplicable and that the trial court should instead have used the analytical method outlined in *United States Fid. & Guar. Co. v. Elizabeth Med. Ctr.* (1998), 129 Ohio App.3d 45, 716 N.E.2d 1201 ("*USF&G*"). In *USF&G*, an insurer denied coverage to a medical center for negligent-credentialing claims, based on an express policy exclusion for malpractice and professional-services claims. Id. at 48–49, 716 N.E.2d 1201. The bodily injuries at issue in the case could have resulted from two causes: (1) the surgical procedures of the doctor (which was clearly excluded from coverage) or (2) the hospital's negligent credentialing of the doctor (which was arguably within coverage). Id. at 51, 716 N.E.2d 1201. In deciding whether negligent credentialing would be excluded, we noted:

{¶ 47} " 'The nature of many liability insurance losses is such that it is almost always possible to theoretically separate the activity which was occurring at the time of the loss (driving, loading, treating patients, and so forth), from some related but antecedent or concurrent activity that arguably contributed to the loss (hiring, supervision, training, packing, and so forth).' 7 Couch on Insurance (3 Ed.1997) 101–157, Section 101: 60.

{¶ 48} "It is often the case that 'the activity which was occurring at the time of the loss' (*e.g.,* treating patients) is excluded from coverage under the insurance policy in question, while the 'related but antecedent or concurrent activity that arguably contributed to the loss' (*e.g.,* hiring, supervision, etc.) is not excluded. In such cases, courts will allow recovery under the policy where the preliminary or concurrent act of planning, supervising, etc. is 'independent' of the excluded cause. Id. Conversely, courts will disallow recovery where the preliminary or concurrent act contributing to the loss is not independent of the excluded cause. The preliminary or concurrent act contributing to the loss is independent of the excluded cause only where the act (1) can provide the basis for a cause of action in and of itself *and* (2) does not require the occurrence of the excluded risk to make it actionable." (Citations omitted.) Id., 129 Ohio App.3d at 51–52, 716 N.E.2d 1201.

{¶ 49} After making these comments in *USF&G*, we noted that a negligent-credentialing claim provides a basis for a cause of action "in and of itself," but that no such claim could be maintained without demonstrating that the plaintiff's injuries were caused by some physician on staff. We therefore found that losses caused by negligent credentialing were not independent of losses caused by improper surgical service or treatment. Accordingly, the negligent-credentialing claims would be excluded from coverage. Id., 129 Ohio App.3d at 52–53, 716 N.E.2d 1201.

{¶ 50} Like *USF&G*, the present case involves two alleged causes of loss: (1) the Valleycrest pollution, which is clearly excluded from coverage, and (2) the business torts surrounding the recapitalization/split-off. Great American admits that the business torts provide separate causes of action. However, Great American also argues that the business torts do not satisfy the second prong of the *USF&G* test, because they are not independent causes of loss. Specifically, absent the Valleycrest environmental liabilities (the excluded risk), WM would not have standing to bring a claim against the Danis companies or directors.

{¶ 51} Danis responds by noting that the second set of wrongful acts in *USF&G* (negligent credentialing) was either preliminary to or concurrent with the excluded activity (medical malpractice). Danis points out that the excluded activity in the present case (pollution) occurred before the loss, and the second set of acts (the reorganization of Danis entities) occurred after the excluded activities. As a result, Danis contends that the *USF&G* analysis has no bearing on the coverage issues and that the *Kish* and *Owens Corning* approach is more appropriate.

{¶ 52} Classifying acts as concurrent, preliminary, or subsequent is not particularly helpful, because any of these types of act can interact with other acts to cause injury. For example, in *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 613 N.E.2d 1014, the court considered whether the intervening negligence of an attending physician absolved a hospital of its prior negligence. Id. at 585, 613 N.E.2d 1014. The court decided that the physician's negligence would not absolve the hospital if both cooperated in proximately causing the injury and if no break in the chain of causation occurred. Id. at paragraph six of the syllabus. In this regard, the court commented:

{¶ 53} "The intervention of a responsible human agency between a wrongful act and an injury does not absolve a defendant from liability if that defendant's prior negligence and the negligence of the intervening agency co-operated in proximately causing the injury. If the original negligence continues to the time of the injury and contributes substantially thereto in conjunction with the intervening act, each may be a proximate, concurring cause for which full liability may be imposed. 'Concurrent negligence consists of the negligence of two or

more persons concurring, not necessarily in point of time, but in point of consequence, in producing a single indivisible injury.'" Id. at 584, 613 N.E.2d 1014, quoting *Garbe v. Halloran* (1948), 150 Ohio St. 476, 38 O.O. 325, 83 N.E.2d 217, paragraph one of the syllabus.

{¶ 54} In the present case, only one loss occurred, and that is the damage caused by the polluted site. The acts of the Danis companies and their directors and officers, whether preliminary, concurrent, or subsequent, did not cause a separate injury or loss; instead, the alleged wrongful acts were an attempt to avoid paying for the loss. This is not the typical situation in which one party commits a tort, and the negligent or wrongful act of another party operates to cause either sharing or a complete release of liability for the injury. To the contrary, the same parties (the Danis companies and their affiliates) are allegedly responsible for the entire loss.

{¶ 55} For a party to be relieved of liability, "a break in the chain of causation must take place. A break will occur when there intervenes between an agency creating a hazard and an injury resulting therefrom another conscious and responsible agency which could or should have eliminated the hazard. However, the intervening cause must be disconnected from the negligence of the first person and must be of itself an efficient, independent, and self-producing cause of the injury." (Citations omitted.) *Berdyck*, 66 Ohio St.3d at 584–585, 613 N.E.2d 1014.

{¶ 56} To be an intervening cause, "'the second negligent act must be both "independent" and "new." In the context of this analysis, the second act is "independent" from the original act if it was not brought into operation by the original act; *i.e.,* the second act must not have occurred as a result of the first. To be considered "new," the second act must not have been reasonably foreseeable when the original act occurred.'" *McCrystal v. Trumbull Mem. Hosp.* (1996), 115 Ohio App.3d 73, 85, 684 N.E.2d 721, quoting *Evanoff v. Ohio Edison Co.* (Nov. 10, 1994), Portage App. No. 93–P–0015, at 20–21, 1994 WL 652635, at * 9.

{¶ 57} Applying the above concepts to the present case, we find that the claims involved in the federal case are not independent of the original pollution settlements. Instead, the underlying settlements are part of the necessary predicate for liability of the Danis defendants in the federal case. The original pollution settlements and the alleged illegal transfers are intertwined, are directly connected, and are not remote from each other. For example, counts one, two, three, and five of the federal complaint allege breaches of agreements that Danis entered into concerning pollution cleanup. Count four requests a declaratory

judgment concerning Danis's obligation for CERCLA response costs. Likewise, count six is based on Danis's alleged obligations under CERCLA.

{¶ 58} In count eight of the federal complaint, WM alleges violations of R.C. 1701.93, which prohibits officers, directors, or agents of corporations from making false statements about the assets and liabilities of a corporation. The violations in this count are based on allegations that Danis knew when it entered into the pollution settlement agreement that it would not be able to financially perform because of the reorganization. Count eight makes similar claims of fraud and violation of R.C. 1701.93 in connection with the SPA and the GEPA, which, again, were documents allocating pollution-response costs.

{¶ 59} The claims in count nine are based on the tort of negligent misrepresentation, described as follows:

{¶ 60} " 'One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their *justifiable reliance* upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.' " (Emphasis sic.) *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, quoting 3 Restatement of the Law 2d, Torts (1965) 126–127, Section 552(1).

{¶ 61} WM contends in count nine of the federal complaint that the Danis defendants failed to exercise reasonable care in communicating information in the SPA and GEPA. Danis warranted in both of these agreements that it had the ability to satisfy its obligations for the Valleycrest cleanup. As with the other federal claims, the basis of this cause of action is the obligation for pollution cleanup.

{¶ 62} Count ten of the federal complaint alleges fraudulent transfers under R.C. 1336.04 and 1336.05 and violation of R.C. 1701.35(B). R.C. 1336.04 and 1336.05 are part of the Ohio Uniform Fraudulent Transfers Act and prohibit transfers that defraud creditors. Underlying both these statutes is a requirement of either existing or anticipated obligations that a debtor is attempting to evade. R.C. 1701.35(B) simply prohibits corporations from purchasing their own shares where doing so would render the corporation insolvent or unable to meet its obligations. Again, the obligations at issue in this cause of action are agreements Danis made about paying for pollution costs.

{¶ 63} In Count 11, WM alleges a conveyance to hinder or defraud creditors and cites R.C. 1313.56, 1313.57, and 1313.58. R.C. 1313.56 voids conveyances made in an attempt to defeat or hinder creditors and allows appointment of a receiver, while R.C. 1313.57 provides for an exception if the party to whom the

property has been conveyed was unaware of the debtor's fraudulent intent. R.C. 1313.58 provides enforcement ability, by giving creditors authority to bring suit. As with the other counts in the federal complaint, the allegations in count 11 refer to the recapitalization as an attempt to avoid the environmental liability Danis owed WM.

{¶ 64} Finally, count 12 alleges civil conspiracy by the Danis defendants to fraudulently transfer assets and avoid indemnification obligations to WM. Civil conspiracy is " ' "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." ' " *Williams v. Aetna Fin. Co.* (1998), 83 Ohio St.3d 464, 475, 700 N.E.2d 859, quoting *Kenty v. Transamerica Premium Ins. Co.* (1995), 72 Ohio St.3d 415, 419, 650 N.E.2d 863, quoting *LeFort v. Century 21–Maitland Realty Co.* (1987), 32 Ohio St.3d 121, 126, 512 N.E.2d 640. "An underlying unlawful act is required before a civil conspiracy claim can succeed." Id. The underlying act alleged in count 12 is the fraudulent transfer of assets to nullify the pollution settlement and indemnification agreements. Again, the pollution agreements are a necessary predicate for the federal claims.

{¶ 65} Based on the above discussion, we find that the federal claims were not independent and new. According to the allegations in the federal complaint, the fraudulent transfers were directly connected to the pollution agreements made by the Danis companies. The fact that a corporation might attempt to evade existing or anticipated liabilities by transferring assets to other affiliated entities and shareholders is also reasonably foreseeable. Consequently, whether we follow the test outlined in *Kish* or the approach taken in *USF&G*, the federal claims appear to "arise out of * * * pollution."

{¶ 66} As an additional point, we do not see a significant difference in the tests used in the two cases. The courts in both *Kish* and *USF&G* were basically looking for a substantial connection between the acts or incidents that occurred. In *Kish*, there was little causal connection other than the fact that but for the original motor vehicle accident, the decedent would not have happened to be standing outside his car where he was shot. In contrast, *USF&G* did not involve a "but for" situation. Instead, the negligent acts of two parties combined to cause injuries. Similarly, the present case does not involve a "but for" situation. As Great American points out, absent the pollution settlement agreements, WM would have had no basis to bring a cause of action against the Danis companies and their directors and officers. Consequently, a substantial and direct connection exists between the settlement agreements and the federal claims, at least if we assume the truth of the facts alleged in the federal complaint.

{¶ 67} *High Voltage Eng. Corp. v. Fed. Ins. Co.* (C.A.1, 1992), 981 F.2d 596, involved a situation like the present. In that case, High Voltage sold a manufac-

turing site to another company, ALP, with assurances that the site had not been contaminated with hazardous waste. That later proved untrue. Further, during the time ALP was trying to persuade High Voltage to clean up the hazardous wastes, High Voltage was also the subject of a hostile tender offer. As part of the takeover transaction, High Voltage assumed liability for loans that financed the takeover.

{¶ 68} Subsequently, ALP sued High Voltage and its directors (who were also partners in a limited partnership that controlled the corporation making the tender offer). Id., 981 F.2d at 597–598. High Voltage provided its insurer with a copy of the complaint, which included allegations of unfair and deceptive trade practices, but the insurer declined coverage, based on pollution and property damage exclusions. Id. at 598.

{¶ 69} Among the underlying claims was the assertion that two High Voltage directors had stalled ALP and had made minimal effort in connection with the problem of hazardous waste contamination. The alleged purpose of the delay was to consummate the merger and liquidate High Voltage assets so they would not be available to ALP. Id., 981 F.2d at 599.

{¶ 70} The pollution exclusion at issue in *High Voltage* is similar to the one in the present case. Specifically, the exclusion stated that the insurer would not be liable under the following condition:

{¶ 71} " '[W]here *all or part* of such claim is, *directly or indirectly,* based on, attributable to, arising out of, resulting from or *in any manner related to the Insured's Wrongful Act(s) concerning:*

{¶ 72} " '(1) *the* actual, *alleged* or threatened *discharge, release or escape of Pollutants* into or on real or personal property, water or the atmosphere.

{¶ 73} " '(2) *any Loss or expense arising out of any direction or request that the Insured test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize Pollutants.'* " (Emphasis added by circuit court.) Id., 981 F.2d at 600.

{¶ 74} The district court found that the alleged wrongful acts clearly related to the pollution of the site, and the First Circuit Court of Appeals agreed. As a result, the First Circuit held that the pollution exclusion applied, and that coverage did not exist. Id. at 600–603.

{¶ 75} The trial court in the present case distinguished *High Voltage*, stating, "[T]he claims against the plaintiffs were based on allegations that they prevented the removal of pollutants. In the present action, the core of the claims against the Plaintiffs in the underlying action revolves around allegations that the purpose of the 1997 restructuring was for the Plaintiffs to escape their liabilities." While this may be true, it is a distinction without a difference. In *High Voltage*,

the allegations were that the defendants delayed cleaning up a contaminated site, and had effected a merger to convey assets and deprive the plaintiffs of the ability to recover cleanup costs. The allegations in the present case are similar, in that Danis agreed to pay for cleanup of a contaminated site but restructured its assets to avoid liability for the cleanup.

{¶ 76} We are also persuaded by the analysis in *Employers Ins. of Wausau v. Duplan Corp.* (S.D.N.Y.1995), 899 F.Supp. 1112. In *Duplan*, Federal Insurance issued various directors' and officers' (D&O) policies to officers and directors of a company accused of polluting a site in the Virgin Islands. The policy had an exclusion similar to the one in the present case, i.e., it excluded claims "based on, arising from, or in consequence of: (1) the actual, alleged, or threatened discharge, release, escape or disposal of Pollutants." Id. at 1128.

{¶ 77} Although the complaint did not allege breach of fiduciary duties, the directors and officers argued that the claims against them potentially asserted breach of fiduciary duties and were potentially covered despite the pollution exclusion. The alleged breach was based on the trustees' duty to allocate trust assets ratably and their decision to allocate trust assets for settlement of other claims. Id.

{¶ 78} In this regard, the directors and officers argued that the challenged trust actions had no connection to the pollution damage. However, the district court disagreed, finding that the substance of the fiduciary duty claim indicated that it arose from and was "inextricably intertwined" with the claims of pollution damage. Id., 899 F.Supp. at 1128. Among other things, the court noted that the attorney general (who was making the breach-of-fiduciary-duty claim) was merely attempting to protect its ability to recover damages in the underlying pollution action, not to recover additional or different damages. Id. at 1129. The district court also noted:

{¶ 79} "[T]he allegations challenging the Trustees' exercise of their fiduciary duty do not convert what is fundamentally a pollution damage claim into a claim triggering Federal's duty to defend under the D&O policies. The Duplan Defendants' argument that no relationship exists between the fiduciary and pollution claims rings hollow. It is no mere coincidence that the fiduciary duty claim is asserted in an action seeking recovery for pollution damages. Quite the contrary, the fiduciary duty claim owes its very existence to the pollution damage claim. Any allegation challenging the Trustees' actions for improper Trust administration would simply be a corollary to the pollution claim—intended to have the effect of allowing the survival of Panex Industries as a defendant and ensuring the maintenance of a fund for recovery against pollution damage. As such, any actual or potential fiduciary duty claims against the Trustees are

directly related to the pollution claims, notwithstanding the fact that the Trustees are not alleged to have actually *caused* the pollution for which recovery is sought.

{¶ 80} "It is an inescapable conclusion that any existing or potential claim alleging the breach of the Trustee's fiduciary duties in the administration of trust assets arises from the underlying claims alleging pollution damage. That being the case, Federal has no duty to defend or indemnify the Duplan Defendants for those claims under the D&O policies." (Emphasis sic.) Id.

{¶ 81} We agree with these conclusions and find them pertinent to the present case. The claims against both corporate and individual Danis defendants are directly related to and arise from claims for pollution damage. Under the policy, Great American is required to advance costs of defense prior to final disposition of any claim only if the claim is covered by the policy. The pollution exclusion specifically states that Great American "shall not be liable to make any payment for Loss in connection with any Claim made against any Insured * * * based upon, arising out of, relating to, directly or indirectly resulting from or in consequence of, or in any way involving actual or alleged seepage, pollution, radiation, emission or contamination of any kind." "Loss," as defined by the policy, includes "costs of defense." (Boldface omitted). Accordingly, the trial court erred in granting summary for the Danis defendants on the duty to advance costs.

{¶ 82} As a further matter, the trial court also found the second part of the pollution exclusion ambiguous. In particular, the trial court commented that the "remaining exclusions, relating to, resulting from, in consequence of, or in any way involving," were too broad and expansive. The court reasoned that if these provisions were read too broadly, they could vitiate all coverage and make the policy worthless.

{¶ 83} Great American contends that the trial court erred in finding this part of the policy ambiguous and in failing to find at least an indirect connection between the pollution settlement and the claims asserted in federal court. In this regard, Great American notes that the policy excludes claims "directly or indirectly resulting from or in consequence of, or in any way involving actual or alleged * * * pollution." According to Great American, an indirect relationship surely existed between the underlying claims and pollution. We agree.

{¶ 84} Great American also notes that the trial court did not say much in its decision about the second part of the pollution exclusion. Again, we agree. The court did discuss intervening cause and legal interpretation of the term "arising from," but it did not specifically comment on the use of the words "directly or indirectly." The case the trial court relied on (*Owens Corning*) also did not discuss the meaning of these words, either. See 1998 WL 774109, at ** 3–6.

{¶ 85} The use of the modifying words "directly or indirectly" indicates that an indirect causal relationship is sufficient for the exclusion to apply. Consequently, even though we have found that the federal claims are intertwined with the pollution settlements, coverage for these claims would additionally be excluded as matters "indirectly related to * * * pollution."

{¶ 86} We also disagree with the trial court's conclusion that the words "relating to, resulting from, in consequence of, or in any way involving * * * pollution" are too broad. In *Owens Corning,* the pollution provision excluded coverage "for any claim directly or indirectly including but not limited to shareholder derivative suits and/or representative class action suits based on[,] arising out of[,] or related to (A) Asbestos or any asbestos related injury or damage." Id., 1998 WL 774109 at * 2.

{¶ 87} The underlying litigation in *Owens Corning* involved a class-action suit brought by shareholders and was based on alleged misrepresentations of the company and its officers that caused a decline in stock prices. Id. at * 1. As we noted earlier, the Sixth Circuit first found that coverage was not precluded by an exclusion of claims "based upon" or "arising out of" asbestos or any asbestos related injury or damage. Id. at ** 4–5.

{¶ 88} The Sixth Circuit also considered the term "related to," but rejected the insurer's contention that the words implied a very loose causal connection. Id., 1998 WL 774109 at * 6. In particular, the court stressed that "the 'looseness' required to exclude coverage in this case would effectively bar all shareholder derivative suits and class action suits under the Policy." Id. The court also noted that if the insurer had intended to exclude coverage of shareholder derivative suits and securities class action suits, it could have specifically done so. Id.

{¶ 89} In the present case, the trial court followed this logic by finding that the terms "relating to, resulting from, in consequence of, or in any way involving * * * pollution" were too broad to be enforced. Once again, we disagree.

{¶ 90} Unlike the policy in *Owens Corning,* the Great American policy includes coverage for derivative suits by shareholders. In fact, the coverage extension is contained within the pollution exclusion itself. Specifically, the policy states that the pollution exclusion "shall not apply to any derivative suit by a security holder of the Company if the security holder bringing such Claim is acting totally independent of, and without the solicitation, assistance, active participation or intervention of any Director or Officer or the Company." (Boldface omitted).

{¶ 91} Accordingly, the concerns of the Sixth Circuit in *Owens Corning* are not present here. Furthermore, we do not find this part of the pollution exclusion ambiguous. To the contrary, the exclusion clearly says that no coverage is provided for claims that are directly or indirectly related to pollution, except

shareholder derivative suits that are instigated independently of the company, its officers, or its directors. The policy does not need to define every situation that might be indirectly linked to pollution. That task is probably impossible, and courts are used to formulating and applying tests for causation, much like those used in *Kish* and *USF&G.*

{¶ 92} "When confronted with an issue of contractual interpretation, the role of a court is to give effect to the intent of the parties to the agreement. * * * We examine the insurance contract as a whole and presume that the intent of the parties is reflected in the language used in the policy. * * * We look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy. * * * When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Westfield Ins. Co. v. Galatis,* 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, at ¶ 11. The Ohio Supreme Court has also stressed that while policy exclusions "will be interpreted as applying only to that which is *clearly* intended to be excluded * * *[,] the rule of strict construction does not permit a court to change the obvious intent of a provision just to impose coverage." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.* (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096.

{¶ 93} The intent of the pollution exclusion is obvious, and that is to preclude coverage for nearly all pollution-related claims. Furthermore, while the Danis companies and officers claim that the provision is ambiguous, what they really mean is that if the pollution exclusion is enforced as it reads, the policy will be rendered illusory. However, that is simply not true. An insurance contract is not illusory where the insured obtains some benefit. *Lakota v. Westfield Ins. Co.* (1998), 132 Ohio App.3d 138, 143, 724 N.E.2d 815. Because the pollution exclusion allows coverage for shareholder derivative suits, even where the claim directly results from pollution, the coverage does offer some benefit to the insured parties.

{¶ 94} As support for the theory that the exclusion is too broad, Danis notes that its business is waste treatment. Accordingly, Danis claims that if the pollution exclusion is applied in the way Great American suggests, it would exclude all company activities. However, this assertion is not supported by the facts. Notably, Gregory McCann's affidavit and the attached organization charts indicate that the activities of the Danis Companies are widespread and involve much more than waste treatment. Although one branch of the Danis Companies deals with environmental matters and landfills, other branches involve real estate and building construction. Consequently, coverage under the Great American policy exists for many kinds of legal claims that would have nothing to do with pollution or waste treatment activities.

{¶ 95} Based on the preceding discussion, Great American's single assignment of error has merit and is sustained. The decision of the trial court will be reversed, and this matter will be remanded for further proceedings.

## II

{¶ 96} As we noted earlier, appellees filed cross-assignments of error contesting certain statements the trial court made in its decision. Specifically, appellees object to the following statement of the trial court:

{¶ 97} "The pollution exclusion is applicable to prevent indemnification in the event that the Plaintiffs are required to pay Waste Management, to the extent that the damages arise out of, are based on, related to, involve, or are a consequence of pollution. Unlike the claims against the Plaintiffs which are based on business transactions, the damages that the Plaintiffs may be required to pay may be based on pollution, in which case, the Defendant would not be required to indemnify the Plaintiffs."

{¶ 98} Appellees also object to the following statement of the trial court:

{¶ 99} "If Plaintiffs are found liable in the Waste Management action for claims that are not covered for the Great American policy, then the Plaintiffs will be required pursuant to the Great American policy, to repay the Defendant the costs of defense for those claims."

{¶ 100} The trial court granted partial summary judgment only to appellees and overruled Great American's summary judgment motion on the indemnification issue. Therefore, the above statements appear to be dicta and of no effect, other than to show the court's thinking about potential future issues. Appellees acknowledge these matters, but say they are appealing simply from an abundance of caution. Based on that sense of caution, appellees have asked us to "reverse" these statements of the trial court.

{¶ 101} Even if the cross-assignments of error were viable to begin with, they are now moot, because of our disposition of Great American's assignment of error. Consequently, the cross-assignments of error will be overruled as moot.

{¶ 102} In light of the preceding discussion, Great American's assignment of error is sustained. Cross-assignments of error one and two of DEMCO, TDC, DEII, DBBC, McCann, Russell, and Thomas Danis, and cross-assignments of error one and two of John Danis are overruled as moot. Accordingly, the decision of the trial court is reversed and this matter is remanded for further proceedings.

Judgment reversed
and cause remanded.

FAIN, P.J., and FREDERICK N. YOUNG, J., concur.