**590**

In re TROUTMAN ENTERPRISES, INC., Debtor.

John Paul Rieser, Chapter 7 Trustee, Plaintiff,

v.

Dinsmore & Shohl, LLP, et al., Defendants.

Bankruptcy No. 99–35371.
Adversary No. 04–2029.
Former Adversary No. 02–3287.

United States Bankruptcy Court,
S.D. Ohio,
Eastern Division at Columbus.

Sept. 9, 2005.

Robert J. Sidman, Tiffany Cobb, Columbus, OH, for Defendant Dinsmore & Shohl, LLP, Vorys, Sater, Seymour and Pease, LLP.

Donald F. Harker, III, Dayton, OH, trustee for Troutman I.

Dale Ann Goldberg, Dayton, OH, Assistant U.S. Attorney.

Wayne P. Novick, Centerville, OH, Special Counsel for State of Ohio Department of Taxation.

Derek A. Farmer, Columbus, OH, for Defendants Wayne Wheat & House of Wheat Funeral Home, Inc., Derek A. Farmer & Assoc. Co., LPA.

Richard D. Palmer, Columbus, OH, for Defendant Contract Processing & Title Agency, Ltd., Richard D. Palmer Co., LPA.

Richard D. Bringardner, Columbus, OH, for Defendant AmeriCredit Financial Services, Inc.

John L. Day Jr., Laura Faulkner, Cincinnati, OH, for Defendant Citicorp Credit Services, Weltman, Weinberg & Reis Co., LPA.

John F. Kostelnik, Stephen F. Gladstone, Matthew H. Matheny, Cleveland, OH, for Defendant Bob Townsend Ford, Ford Frantz Ward LLP.

*MEMORANDUM OPINION ON (1) MO-TION OF DEFENDANT DINS-MORE & SHOHL, LLP FOR SUM-MARY JUDGMENT AS TO ALL CLAIMS OF PLAINTIFF'S COM-PLAINT; (2) DEFENDANTS WAYNE L. WHEAT AND HOUSE OF WHEAT FUNERAL HOME'S MOTION FOR SUMMARY JUDG-MENT AND (3) MOTION OF DE-FENDANT CONTRACT PROCESS-ING & TITLE AGENCY, LTD. FOR SUMMARY JUDGMENT AS TO ALL CLAIMS OF PLAINTIFF'S COMPLAINT*

JOHN E. HOFFMAN, JR., Bankruptcy Judge.

## I. Introduction

This adversary proceeding arises from an unusual procedural morass involving two separate, but related, bankruptcy estates and multiple appellate proceedings before the Sixth Circuit Bankruptcy Appellate Panel ("BAP") and Court of Appeals. At issue here is the finality of an order entered by Chief Judge Waldron on March 10, 2000 ("Distribution Order"), which authorized Firstar Bank to distribute $1 million in insurance proceeds payable to Troutman Enterprises, Inc., as the beneficiary of a life insurance policy on its deceased officer and shareholder, Roger Troutman.

Four of the Defendants[1] ("Movants") have filed motions seeking summary judgment on all claims asserted against them by John Paul Rieser ("Rieser" or "Trustee"), trustee of the bankruptcy estate of Troutman Enterprises, Inc. in Case No. 99–35371, which was commenced as an involuntary Chapter 7 proceeding ("Involun-tary TEI"). The Movants urge the Court to accord finality to the Distribution Order and grant them summary judgment on the Trustee's claims for avoidance and recovery of the funds that were disbursed in reliance on the Distribution Order. The Trustee opposes the motions for summary judgment, arguing that he has valid claims for avoidance and recovery of the funds in question because the *nunc pro tunc* order for relief entered by Chief Judge Waldron in the Involuntary TEI case effectively nullified the Distribution Order.

While the Trustee's claims stem from the complex and tortuous procedural history detailed below, the principle that governs their disposition is a simple one: parties are entitled to rely on final court orders that are neither appealed nor stayed. Because the Distribution Order, which was never appealed or stayed, relinquished the bankruptcy court's jurisdiction over the life insurance proceeds, the claims asserted in the Trustee's complaint ("Complaint")—which are based on the premise that, notwithstanding the Distribution Order, the insurance proceeds were property of the Involuntary TEI bankruptcy estate when transferred—must be dismissed.

This memorandum opinion and order constitute the Court's findings of fact and conclusions of law. Fed.R.Civ.P. 52 (made applicable here by Fed. R. Bankr.P. 7052 and 9014).

## II. Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. 28 U.S.C. § 157(b)(2).

---

1. Dinsmore & Shohl, LLP ("Dinsmore"); House of Wheat Funeral Home, Inc. and Wayne Wheat (collectively, "Wheat") and Contract Processing & Title Agency, Ltd. ("Contract P & T").

## III. Factual and Procedural Background

### A. The Troutman Litigation

#### 1. Events Leading Up to Litigation

The genesis of the litigation involving Troutman Enterprises, Inc. ("TEI") can be traced back nearly 20 years to the purchase of a life insurance policy on one of TEI's principals. On July 11, 1986, TEI purchased a $500,000 life insurance policy on Larry Troutman ("First Policy"), a shareholder and officer of TEI. TEI owned the First Policy and was its named beneficiary.

On April 23, 1992, TEI filed a voluntary Chapter 11 petition and the case was assigned to Chief Judge Waldron. *See In re Troutman Enters., Inc.*, No. 92–31988 *("Troutman I")*. On September 1, 1993, TEI's Amended Plan of Reorganization ("Plan") was confirmed. *See id.*, Docs. 134, 165. The Plan called for all allowed unsecured claims, not otherwise provided for, to be paid pro rata from a fund of $10,000. *See id.*, Doc. 134. Following confirmation of the Plan, TEI emerged from Chapter 11 and continued operating as a reorganized debtor ("Reorganized TEI"). TEI did not disclose its interest as owner and beneficiary of the First Policy, either in the schedules filed with its bankruptcy petition or during the pendency of its Chapter 11 case. *See id.*, Docs. 1, 133.

On January 30, 1995, approximately 17 months after the order confirming the Plan was entered, Reorganized TEI purchased a $1,000,000 life insurance policy on Roger Troutman ("Second Policy"), a shareholder and officer of Reorganized TEI, and the brother of Larry Troutman. Reorganized TEI was both the owner and named beneficiary of the Second Policy.

When Reorganized TEI defaulted on its obligations under the Plan, the Internal Revenue Service ("IRS") moved to convert the case to a Chapter 7 liquidation proceeding. The Court granted the unopposed motion, and *Troutman I* was converted on January 4, 1996. Thus, whatever remained in the bankruptcy estate of *Troutman I* became "Converted TEI." *See id.*, Doc. 247. Donald F. Harker, Jr. ("Harker") was appointed Chapter 7 trustee of the bankruptcy estate of Converted TEI. On April 22, 1996, during the pendency of the Chapter 7 case and without Harker's knowledge or consent, TEI executed documents that purported to transfer ownership of both the First and Second Policies from TEI to Roger Tee Enterprises, Inc., a related corporation. TEI, however, remained at all times the named beneficiary of both policies. On April 25, 1999, Larry and Roger Troutman died in an apparent murder-suicide and the proceeds of the First and Second Policies became payable to TEI.

On May 14, 1999, Converted TEI amended its Schedule B (Personal Property) in *Troutman I* and, for the first time, disclosed its interest in the First and Second Policies. *See id.*, Doc. 284. On June 11, 1999, Harker brought an adversary proceeding—*Harker v. Troutman (In re Troutman Enters., Inc.)*, Adv. Pro. No. 99–3099 *("Harker Proceeding")*—against the life insurer that issued the First and Second Policies, seeking turnover of the proceeds of both policies. The insurer interpleaded the proceeds of the First and Second Policies and was dismissed as a defendant from the *Harker Proceeding*. The remaining shareholders of TEI ("Shareholders") subsequently intervened in the *Harker Proceeding* as third-party defendants, asserting that they were entitled to the proceeds of the First and Second Policies and moving for dismissal and summary judgment.

On October 18, 1999, while the *Harker Proceeding* for turnover of the insurance proceeds was pending, and despite the fact that *Troutman I* had converted to Chapter 7, four petitioning creditors ("Petitioning Creditors") filed an involuntary Chapter 7 petition against Reorganized TEI. The Petitioning Creditors based their filing on Reorganized TEI's failure to pay their claims in accordance with the terms of the Plan. On November 10, 1999, Reorganized TEI moved for dismissal of the involuntary petition. *See In re Troutman Enters., Inc.*, Case No. 99–35371 *("Troutman II")*, Doc. 14.

On January 24, 2000, Chief Judge Waldron issued decisions in both the *Harker Proceeding* and *Troutman II* that are described in detail below.

## 2. The *Harker Proceeding* Decision and Appeals

In the *Harker Proceeding*, Chief Judge Waldron made two key rulings. Although the court rejected Harker's complaint for turnover of the proceeds of the Second Policy to the Chapter 7 estate of Converted TEI, it granted turnover of the proceeds of the First Policy to the Converted TEI estate. *See Harker Proceeding*, 244 B.R. at 767–69. The court noted that Reorganized TEI acquired the Second Policy 17 months after confirmation of the Plan. Relying on § 1141(b) & (c) of the Bankruptcy Code,[2] the court determined that

the proceeds of the Second Policy were not property of the Chapter 7 estate of Converted TEI because Reorganized TEI was the original owner and, at all times, the named beneficiary of the Second Policy. *See id.* at 767. Chief Judge Waldron reasoned:

> TEI, operating postconfirmation as the Reorganized Debtor, was fully authorized to conduct its business affairs and, as a result of the Confirmed Amended Plan and the effect of § 1141(b) & (c), hold assets separate and apart from the original property of the Chapter 11 estate. Such assets [including the proceeds of the Second Policy] are not included as property of a converted debtor's estate.

*Id.* at 766 (citations omitted).

As for the First Policy, the court noted that it had been acquired in 1986, some six years before TEI filed for Chapter 11 bankruptcy relief, but its existence had not been disclosed until the proceeds of the First Policy became payable following the death of Larry Troutman. *See id.* at 768. The court held that § 1141(b)'s revesting provision did not apply with respect to the First Policy because TEI had failed to disclose the policy as required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. The court relied on the doctrine of judicial estoppel, as well as caselaw interpreting 11 U.S.C. § 554(c) and (d),[3] which governs abandonment of

2. Subsections (b) & (c) of § 1141 of the Bankruptcy Code, which govern the effect of confirmation of a Chapter 11 plan, provide:

 (b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.
 (c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by

 the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.
 11 U.S.C. § 1141(b) & (c).

3. Subsections (c) & (d) of § 554 of the Code state:

 (c) Unless the court orders otherwise, any property scheduled under section 521(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title.

property of the bankruptcy estate, in determining that the proceeds of the First Policy were property of the Chapter 7 estate of Converted TEI. Chief Judge Waldron concluded:

> Reading these two subsections together, property not scheduled pursuant to § 521(1) is not abandoned under § 554(c) and hence remains property of the estate pursuant to § 554(d) as property neither administered nor abandoned. Cases are uniform in following this rationale to conclude that a debtor's failure to disclose an asset prevents the asset from being administered in the bankruptcy proceeding and results in the asset remaining property of the estate.
>
> Pursuant to the above authority, TEI's failure to comply with the Code's requirements to disclose the existence of the First Policy during the Chapter 11 proceeding prevented that asset from being administered in the Chapter 11 case. Thus, the First Policy remained property of the Chapter 11 estate and did not revest in ... Reorganized [TEI]. As discussed previously, property which does not revest in a reorganized debtor upon confirmation becomes property of the Chapter 7 estate upon conversion. Accordingly, the proceeds of the First Policy payable to TEI upon the death of Larry Troutman constitute property of the estate of the Converted Debtor. The Chapter 7 Trustee's complaint for turnover of the proceeds of the First Policy is granted.

*Id.* at 769 (citations omitted). The Shareholders appealed the court's decision requiring turnover of the proceeds of the First Policy to the Chapter 7 estate of Converted TEI. Although he challenged the standing of the Shareholders to bring the appeal, Harker did not appeal the court's decision denying turnover of the proceeds of the Second Policy.

On September 26, 2000, the BAP found that the Shareholders did have standing to bring their appeal because, "as shareholders of the reorganized debtor they may have some interest in the proceeds of the policy[,]" *Harker v. Troutman (In re Troutman Enters., Inc.)*, 253 B.R. 1, 3 (6th Cir. BAP 2000) (*"First BAP Decision"*), and reversed Chief Judge Waldron's decision requiring turnover of the proceeds of the First Policy to the Chapter 7 estate of Converted TEI. The BAP ruled that the proceeds of the First Policy revested in Reorganized TEI upon Plan confirmation, reasoning:

> In the present case, the bankruptcy court determined that because the insurance policy had not been disclosed in the schedules, it did not vest in the reorganized debtor upon plan confirmation. In holding that the policy was property of the converted Chapter 7 bankruptcy estate, the bankruptcy court cited cases applying judicial estoppel and other cases applying § 554. For the following reasons, the Panel disagrees with the bankruptcy court's determination.
>
> Section 1141(b) plainly states that unless the confirmed plan or order confirming plan provides otherwise, all property of the estate vests in the reorganized debtor on confirmation. There is no explicit exception in the Code for undisclosed property.
>
> The Bankruptcy Act did provide for the result that the bankruptcy court reached here. The Act stated that only property "dealt with" by the plan vested in the reorganized debtor upon confir-

---

(d) Unless the court orders otherwise, property of the estate that is not abandoned under this section and that is not adminis-

tered in the case remains property of the estate.

11 U.S.C. § 554(c) & (d).

mation. Applying the Act's terms, an undisclosed asset would not vest with the reorganized debtor because it was not "dealt with" by the plan. However, under the plain language of the Bankruptcy Code, all property of the estate vests with the reorganized debtor.

Moreover, the bankruptcy court's reliance on § 554(d) was misplaced. Section 554(d) provides that "[u]nless the court orders otherwise, property of the estate that is not abandoned under this section and that is not administered in the case remains property of the estate." 11 U.S.C. § 554(d). However, § 554(d) is not applicable in the context of a Chapter 11 case with a confirmed plan. A Chapter 11 trustee (or debtor in possession) does not "abandon" property upon plan confirmation. Rather, upon plan confirmation, pursuant to § 1141(b), all of the property of the estate vests with the reorganized debtor. *First BAP Decision,* 253 B.R. at 6 (citations omitted). The BAP also concluded that the bankruptcy court improperly relied on the doctrine of judicial estoppel in determining that the First Policy did not vest in Reorganized TEI upon Plan confirmation. *See id.*

Harker appealed the *First BAP Decision.* On March 15, 2002, the Sixth Circuit Court of Appeals vacated the *First BAP Decision* and affirmed the judgment of the bankruptcy court, finding that the Shareholders lacked standing to appeal. *See Harker v. Troutman (In re Troutman Enters., Inc.),* 286 F.3d 359, 361–62 (6th Cir.2002). The Sixth Circuit stated:

Associated with the prohibition on third-party standing is the so-called shareholder standing rule, the "long-standing equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment." *Franchise Tax Bd. of Calif. v. Alcan Aluminium Ltd.,* 493 U.S. 331, 336, 110 S.Ct. 661, 107 L.Ed.2d 696 (1990); *see also Canderm Pharmacal, Ltd. v. Elder Pharm., Inc.,* 862 F.2d 597, 602–03 (6th Cir.1988). A shareholder may invoke the exception to this rule if they can demonstrate a "direct, personal interest" in the cause of action. *Franchise Tax Bd.,* 493 U.S. at 336, 110 S.Ct. 661, 107 L.Ed.2d 696.

In the bankruptcy context, courts have relied on the shareholder standing rule in holding that shareholders could not appeal a bankruptcy court decision where they asserted only a derivative interest. *Pignato v. Dein Host, Inc. (In re Dein Host, Inc.),* 835 F.2d 402, 405–06 (1st Cir.1987); *In re Central Ice Cream,* 62 B.R. 357, 359–60 (N.D.Ill. 1986); *Holta v. Zerbetz (In re Anchorage Nautical Tours, Inc.),* 145 B.R. 637, 641–42 (9th Cir. BAP 1992). For example, the First Circuit ruled that a sole shareholder lacked standing to challenge an order concerning assumption of a lease because he asserted only corporate harm and lacked a personal or direct interest in the proceedings. *Dein Host, Inc.,* 835 F.2d at 405; *cf. New York Life Ins. Co. v. Revco D. S., Inc. (In re Revco D. S., Inc.),* 901 F.2d 1359, 1363 (6th Cir.1990) (ruling that preferred stockholder satisfied bankruptcy standing requirements to challenge portion of order concerning interest payments on prepetition debt).

In this case, the Shareholders cannot assert any personal or direct interest in the proceeds of the life insurance policy on Larry Troutman. The record indicates that Troutman Enterprises is both policy owner and beneficiary. Even if we were to recognize the purported

transfer of policy ownership, the Shareholders would still lack a personal or direct interest in the policy. Without a direct interest in the life insurance policy, the Shareholders cannot invoke the exception to the shareholder standing rule. Therefore, we find that the Shareholders did not have standing to appeal the bankruptcy court's decision. *Id.* at 364–65. Therefore, the Harker Proceeding and its subsequent appeals resulted in turnover of the proceeds of the First Policy to the Chapter 7 estate of Converted TEI.

### 3. The *Troutman II* Decision and Appeal

On January 24, 2000, Chief Judge Waldron also issued a decision in *Troutman II* granting the motion of Reorganized TEI to dismiss the involuntary petition brought against it by the Petitioning Creditors. *See In re Troutman Enters., Inc. (Troutman II)*, 244 B.R. 106, 111–12 (Bankr. S.D.Ohio 2000). Reorganized TEI based its motion to dismiss on the ground that the Petitioning Creditors did not hold claims against it after the conversion of *Troutman I* from a Chapter 11 to a Chapter 7 case, and thus lacked standing to file an involuntary petition under § 303(b) of

the Bankruptcy Code.[4] Chief Judge Waldron found that 11 U.S.C. § 348(d)[5] limited the Petitioning Creditors to their claims under the Plan in the Converted TEI case *(Troutman I)* and precluded them from asserting claims against the estate of Reorganized TEI in *Troutman II*. Based on its conclusion that the Petitioning Creditors did not hold claims against the Reorganized TEI estate, the court dismissed the involuntary petition, reasoning:

> Each claim advanced by the Petitioning Creditors as a basis for the involuntary petition is a claim treated in TEI's confirmed Chapter 11 plan, and hence, each of the Petitioning Creditors' claims arose after the order for relief in the Chapter 11 and prior to the conversion to Chapter 7. Pursuant to § 348(d), the Petitioning Creditors' claims arising from TEI's confirmed Chapter 11 plan are limited to the treatment accorded in the plan, and are deemed to have arisen prepetition and thus will be accorded whatever rights to collateral and distribution to unsecured creditors are appropriate to prepetition claims in the Chapter 7 case. Accordingly, the Petitioning Creditors do not have claims which can be asserted against ... Reorganized [TEI], but are now limited to asserting

**4.** In 1999, § 303(b) of the Bankruptcy Code read as follows:

> (b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $10,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547,

548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $10,775 of such claims[.]

11 U.S.C. § 303(b)(1) & (2) (1994) (superceded).

**5.** Section 348(d) of the Code states:

> (d) A claim against the estate or the debtor that arises after the order for relief but before conversion in a case that is converted under section 1112, 1208, or 1307 of this title, other than a claim specified in section 503(b) of this title, shall be treated for all purposes as if such claim had arisen immediately before the date of the filing of the petition.

11 U.S.C. § 348(d).

their claims against ... [C]onverted [TEI] in the context of the Chapter 7 case....

. . . .

By relegating all postpetition, preconversion claims, including those arising from the confirmation of a Chapter 11 plan, to the status of prepetition claims upon conversion to Chapter 7, § 348(d) leaves the Petitioning Creditors without claims against ... Reorganized [TEI] and, accordingly, unable to satisfy the requirements of bringing an involuntary petition pursuant to § 303(b).

*Id.* at 111–12 (citations omitted). One of the Petitioning Creditors, National City Bank ("NCB"), appealed the court's decision to dismiss the involuntary petition against Reorganized TEI. See *Troutman II*, Doc. 40 ("NCB Appeal").

On March 10, 2000, following the dismissal of the involuntary petition and during the pendency of the NCB Appeal, Chief Judge Waldron entered the Distribution Order, which authorized distribution of the Second Policy proceeds. The Distribution Order was entered on the docket in *Troutman I*, *Troutman II* and the *Harker Proceeding.* See *Troutman I*, Doc. 304; *Troutman II*, Doc. 60; *Harker Proceeding*, Doc. 51. The Distribution Order included the following language:

The court has determined these funds (the proceeds of the Second Policy) are not property of any bankruptcy estate presently within the jurisdiction of this court, and the court intends to neither assert nor accept any further jurisdiction over these funds. Accordingly, Firstar Bank may distribute these funds plus any interest earned thereon in accordance with applicable nonbankruptcy law.

*Id.*[6] On the same day that Chief Judge Waldron entered the Distribution Order, he also entered an order denying a motion by NCB to prohibit Reorganized TEI from disposing of its property, including the proceeds of the Second Policy, during the pendency of the NCB Appeal.[7] The docket in *Troutman II* reflects that neither NCB nor any other party ever appealed that denial. Nor did NCB or any other party either appeal or move to stay the Distribution Order.

On September 26, 2000, the BAP vacated the court's order dismissing the involuntary petition against Reorganized TEI and remanded the case for further proceedings. The BAP concluded that while § 348(d) determined the nature of the Petitioning Creditors' claims in *Troutman I*, it did not eliminate their claims against Reorganized TEI. See *Nat'l City Bank v. Troutman Enters., Inc. (In re Troutman Enters., Inc.)*, 253 B.R. 8, 12 (6th Cir. BAP 2000) ("*Second BAP Decision*"). The BAP explained its rationale for reversing the court's dismissal of the involuntary petition:

We reach this conclusion by considering § 348(d) together with the law surrounding conversion of confirmed cases. As discussed above, conversion does not disturb confirmation or revoke the dis-

6. The *First BAP Decision* noted that the bankruptcy court had entered the Distribution Order. *See First BAP Decision,* 253 B.R. at 5 ("The bankruptcy court entered an order authorizing the distribution of the interpleaded funds in accordance with the decision.").

7. *See* Motion for Stay of the Order Granting Motion to Dismiss Involuntary Petition and Motion for Order Prohibiting Reorganized Debtor from Disposing of its Property During the Pendency of Appeal (*Troutman II,* Doc. 34); Order Denying Motion for Stay of the Order Granting Motion to Dismiss Involuntary Petition and Motion for Order Prohibiting Reorganized Debtor from Disposing of its Property During the Pendency of Appeal (*Id.,* Doc. 59).

charge of preconfirmation debt. *See In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458; *Bank of Louisiana v. Pavlovich (In re Pavlovich)*, 952 F.2d 114 (5th Cir.1992). Property which revested in a reorganized debtor at confirmation remains property of that entity; conversion does not bring that property into the converted case. *Harker v. Troutman (In re Troutman)*, 253 B.R. 1 (6th Cir. BAP 2000). *See also In re T.S. Note Co.*, 140 B.R. 812, 813–814 (Bankr.D.Kan.1992) ("[W]hat is being converted … are the cases and the assets, if any, whether tangible or intangible, remaining in the debtors' pre-confirmation estates … If the post-confirmation entities and their assets are to be administered under chapter 7, new voluntary or involuntary filings must be made."). In this case, therefore, the Reorganized Debtor continued its separate existence as a legal entity, with whatever assets it owned, even after conversion. As the conversion did not negate the contract between the Reorganized Debtor and the Petitioning Creditors for payment of the Plan Claims, the Reorganized Debtor remains liable for those claims. The Petitioning Creditors, consequently, hold claims against the Reorganized Debtor and are eligible to file an involuntary petition against it if they meet the other requirements of § 303.

Section 348(d) does not require a different result. That section "governs the relative priorities of pre-petition and post-petition pre-conversion claims. Its principal function is to distinguish between Chapter 11 administrative priority claims and non-priority claims, for the former receive a higher distributional priority in the converted Chapter 7 case." *In re Pavlovich*, 952 F.2d at 118–119 (internal citation omitted). Consistent with this function, the impact of § 348(d) is appropriately limited to the Converted Case, so that the Plan Claims are treated as prepetition claims for all purposes in that case. The section does not, however, extend beyond the Converted Case to extinguish the Reorganized Debtor's contractual liability for the Plan Claims. Were it otherwise, the Petitioning Creditors would be limited to recovering from the assets of the Converted Case, while the defaulting Reorganized Debtor retained its property free of those claims. The language and legislative history of § 348 do not suggest that Congress intended such a result. Instead, reading § 348(d) in the manner adopted by the Panel gives effect both to the language of § 348 and also to the rights and obligations that flow from confirmation under § 1141.

. . . .

In sum, because conversion did not undo the plan confirmation and § 348(d) does not apply to the Plan Claims outside of the Converted Case, the Petitioning Creditors continue to hold claims against the Reorganized Debtor and they are not precluded as a matter of law from requesting involuntary relief under § 303 against that entity.

*Second BAP Decision*, 253 B.R. at 13–14. On October 13, 2000, Reorganized TEI appealed the *Second BAP Decision*.

On March 27, 2001, following issuance of the *Second BAP Decision*, Chief Judge Waldron entered an order for relief in *Troutman II* ("Order for Relief"). The Order for Relief recited that it was entered *nunc pro tunc* to October 18, 1999— the date the involuntary petition was filed. *See Troutman II*, Doc. 106. On May 16, 2001, Rieser was appointed trustee for the *Troutman II* estate.

On June 4, 2001, Rieser moved to dismiss Reorganized TEI's appeal of the *Sec-*

*ond BAP Decision* reinstating the involuntary petition against Reorganized TEI. The Sixth Circuit granted the motion and dismissed the appeal.

## B. The *Rieser Proceeding* Currently Before the Court

On May 14, 2002, Rieser brought the present adversary proceeding *("Rieser Proceeding")* in *Troutman II* against entities that received or transferred the proceeds of the Second Policy after Chief Judge Waldron entered the Distribution Order. As part of his Complaint, Rieser seeks to recover the proceeds of the Second Policy, which were deposited into and disbursed from Dinsmore's Interest on Lawyer Trust Account ("IOLTA"), and to recover the portion of the proceeds that each of the other Defendants received from the distribution. Rieser also named the following parties as Defendants: Cohen, Todd, Kite & Stanford, LLC ("Cohen Todd");[8] Rufus Troutman; Leslie Troutman; Terry Troutman; Carolyn Troutman; Bob Townsend Ford; Americredit Financial Services, Inc.; Citibank Visa and John Does I–X.

Because the Order for Relief was entered *nunc pro tunc* to October 18, 1999, which predates the entry of the Distribution Order by nearly five months, Rieser bases his theory for recovery of the proceeds of the Second Policy on the notion that the Order for Relief supercedes and accordingly nullifies the legal effect of the Distribution Order. *See* Compl. ¶ 9. Rieser seeks to recover $673,466.25[9] of the proceeds of the Second Policy (including interest thereon) distributed by or to the Defendants. Rieser alleges that the pro-

ceeds of the Second Policy constituted property of the estate of Reorganized TEI as defined in § 541 of the Bankruptcy Code at the time they were disbursed. *See id.* ¶ 12.

In his Complaint, Rieser lists the disbursements of the proceeds of the Second Policy from Firstar Bank totaling $673,466.25 and the alleged subsequent transfers occurring after March 10, 2000 that resulted in the complete liquidation of the proceeds. *See id.* ¶¶ 36–50. It is undisputed that the disbursements, receipts and all transfers of the proceeds of the Second Policy (collectively, "Transfers") by all of the Defendants occurred after the entry of the Distribution Order on March 10, 2000. According to Rieser, the Transfers were made with the intent "to ensure that the [cash distributed] ... would not be paid over to the [b]ankruptcy [e]state of [Reorganized TEI]." *Id.* ¶ 44. In an effort to avoid the Transfers and recover the proceeds of the Second Policy, Rieser brought the following claims:

First Claim for Relief: Turnover of property or value under 11 U.S.C. § 542 and 11 U.S.C. § 363 against all Defendants;

Second Claim for Relief: Theft and conversion against Dinsmore, Cohen Todd and Rufus Troutman;

Third Claim for Relief: 11 U.S.C. § 549 postpetition transfers against all Defendants;

Fourth Claim for Relief: 11 U.S.C. § 548 fraudulent transfers against all Defendants;

Fifth Claim for Relief: 11 U.S.C. § 547 preferential transfers against all Defendants;

---

**8.** Rieser subsequently dismissed his claims against Cohen Todd. *See Rieser Proceeding,* Doc. 75.

**9.** Of the $1 million in proceeds from the First Policy (plus accumulated interest), $381,818.20 was distributed to the IRS. Rieser does not seek avoidance or recovery of this transfer to the IRS.

Sixth Claim for Relief: Ohio Uniform Fraudulent Transfer Act ("UFTA") claims against all Defendants;

Seventh Claim for Relief: Fraudulent Conveyances—Ohio Revised Code §§ 1313.56 through 1313.58 against all Defendants;

Eighth Claim for Relief: 11 U.S.C. § 329 excessive legal fees against Dinsmore and Cohen Todd;

Ninth Claim for Relief: Objection to any and all proofs of claim filed or to be filed by Defendants;

Tenth Claim for Relief: Accounting and imposition of declaration of trust and disgorgement of property received or transferred to or for the benefit of Defendants;

Eleventh Claim for Relief: Costs, reasonable attorney fees and other relief against Defendants.

Compl. ¶¶ 51–110.

On June 4, 2002, Chief Judge Waldron entered his Order Transferring *[Rieser Proceeding]* from Judge Thomas F. Waldron to Judge John Hoffman. *See Rieser Proceeding,* Doc. 27. On November 18, 2002, the Court stayed the *Rieser Proceeding* pending the distribution of funds in *Troutman I. See id.,* Doc. 71. The stay was lifted on June 21, 2004. *See id.,* Doc. 104.

## C. The Pending Motions

The following motions ("Pending Motions") are before the Court:

1. Motion of Defendant Dinsmore & Shohl LLP for Summary Judgment as to All Claims of Plaintiff's Complaint (Doc. 88);

2. Motion of Defendant Dinsmore & Shohl LLP for Partial Judgment on the Pleadings (Doc. 89);

3. Motion of Plaintiff John Paul Rieser, Trustee Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure and Memorandum Contra Motion of Defendant Dinsmore & Shohl LLP for Summary Judgment as to All Claims of Plaintiff's Complaint (Doc. 91) and Notice of Filing Affidavit of John Paul Rieser, Trustee in Support of Motion of John Paul Rieser, Trustee Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure (Doc. 103);

4. Defendants Wayne L. Wheat and House of Wheat Funeral Home's Motion for Summary Judgment (Doc. 106);

5. Motion of Defendant Contract Processing & Title Agency, Ltd. for Summary Judgment as to All Claims of Plaintiff's Complaint (Doc. 107);

6. Motion of Plaintiff John Paul Rieser, Trustee Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure and Memorandum Contra Motion of Defendant Contract Processing & Title Agency, Ltd. for Summary Judgment as to All Claims of Plaintiff's Complaint (Doc. 108); and

7. Motion of Plaintiff John Paul Rieser, Trustee Pursuant to Rule 56(f) of the Federal Rules of Civil Procedure and Memorandum Contra Defendants Wayne L. Wheat and House of Wheat Funeral Home's Motion for Summary Judgment (Doc. 109).

The Court held a hearing ("Hearing") on the Pending Motions on May 16, 2005. At the Court's direction, the parties focused their arguments on the legal effect of the Distribution Order and the *nunc pro tunc* entry of the Order for Relief on the claims brought by the Trustee in this adversary proceeding.

At the conclusion of the Hearing, the Court announced an oral decision granting the Movants' respective motions for sum-

mary judgment. The Court asked the parties to submit a proposed order journalizing its oral decision. While the parties submitted a proposed order on June 22, 2005, the proposed order recited that it had been reviewed, but not approved by the Trustee. Because the parties apparently were unable to agree on the language of the order, and due to the exceedingly poor quality of the Hearing transcript (*see Rieser Proceeding*, Doc. 117), the Court issues this Memorandum Opinion to supplement its oral decision and fully explain the basis of its ruling.

## IV. Legal Analysis

### A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c) (made applicable to this adversary proceeding by Fed. R. Bankr.P. 7056). In order to prevail, the movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(a)) (emphasis deleted).

The mere allegation of the existence of a factual dispute is insufficient to defeat a summary judgment motion. There must exist in the record a genuine issue of material fact. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has the "potential to affect the outcome of the suit under applicable law."

*FDIC v. Anchor Props.,* 13 F.3d 27, 30 (1st Cir.1994) (citation omitted). "[A]s to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Niecko v. Emro Mktg. Co.,* 973 F.2d 1296, 1304 (6th Cir.1992) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

### B. Neither the *Second BAP Decision* nor the *Nunc Pro Tunc* Entry of the Order for Relief Affected the Validity or Finality of the Distribution Order

Dinsmore's summary judgment motion ("Dinsmore Motion"), which Wheat and Contract P & T incorporate by reference in their motions, asserts that Dinsmore is entitled to judgment as a matter of law on all claims in the Trustee's Complaint because the Distribution Order bars the claims. Relying on the principle of finality, Dinsmore argues that the Distribution Order prevents the Court from exercising any jurisdiction over the proceeds of the Second Policy, including the Trustee's claims seeking avoidance and recovery of the proceeds. Dinsmore contends that:

> [t]he 2000 [Distribution] Order is clear and unequivocal: this Court "intends to neither assert nor accept any further jurisdiction over [the proceeds of the Second Policy]." The March 2000 Order also authorized and directed Firstar to "distribute [the proceeds of the Second Policy] plus any interest earned thereon in accordance with applicable nonbankruptcy law." *Id.* By its very terms, the Court's Order extinguished any further claims to the [proceeds of the Second Policy] under bankruptcy law. For the *Troutman II* Trustee to prevail on any

of his claims, this Court would be required to exercise further jurisdiction over the [proceeds of the Second Policy], which would be directly contrary to the 2000 [Distribution] Order. Because the [Distribution] Order was not appealed and is thus final, the *Troutman II* Trustee is now barred from invoking this Court's jurisdiction over the [proceeds of the Second Policy].

Dinsmore Motion at 8 (citing Distribution Order). Dinsmore also contends that it reasonably relied on the plain meaning of the Distribution Order when it took possession of and disbursed the proceeds of the Second Policy to third parties.[10] Dinsmore asserts that because the Petitioning Creditors in *Troutman II* failed to appeal or obtain a stay of the Distribution Order, it was entitled to rely on the Distribution Order's finality. According to Dinsmore, it would be inequitable for the Court to nullify the effect of the Distribution Order by now retroactively asserting jurisdiction over the proceeds of the Second Policy in this adversary proceeding. *See id.*

■ Dinsmore's argument is well-taken. Dinsmore reasonably relied on the unambiguous terms of the Distribution Order, which clearly and unconditionally relinquished bankruptcy court jurisdiction over the proceeds of the Second Policy. It is undisputed that the Distribution Order was a final order. And it is also undisputed that the Petitioning Creditors neither appealed nor obtained a stay of the Distribution Order. "A disposition is a final order if it contains a full adjudication of the issues at bar, and clearly evidences the judge's intention that it be the court's final act in the matter." *Key Bar Invs., Inc. v.*

*Cahn (In re Cahn),* 188 B.R. 627, 629 (9th Cir. BAP 1995) (citation and quotation marks omitted). "Even a minute entry order can be a final, appealable order if it fully adjudicates the issues and clearly evidences the court's intent that the order be the court's final act." *Id.* at 630 (citation and quotation marks omitted). The Petitioning Creditors' failure to file a timely notice of appeal of the Distribution Order "creates a jurisdictional defect barring appellate review." *Shareholders, Sheridan Broadcasting Corp. v. Sound Radio, Inc.,* 109 F.3d 873, 879 (3d Cir.1997). Although appellate review of the Distribution Order has long since been foreclosed, the Trustee is attempting to obtain indirectly through this adversary proceeding that which he cannot directly obtain—review, and ultimately nullification, of the Distribution Order.

■ "The value of finality of judgments in both civil and criminal law is a bedrock principle of American jurisprudence." *United States v. $398,950,* 1999 WL 984424, at *3 (S.D.Fla.1999). *See also Hawkins v. Freeman,* 195 F.3d 732, 759 n. 8 (4th Cir.1999) (Murnaghan, J., dissenting) ("[T]he concept of finality is [embedded] in American jurisprudence."); *Powers v. Boston Cooper Corp.,* 926 F.2d 109, 112 (1st Cir.1991) ("Finality is a critically important concept in our system of jurisprudence. At some point, battles must end.") (internal quotation marks omitted); *Oregon v. Champion Int'l Corp.,* 680 F.2d 1300, 1301 (9th Cir.1982) (Boochever, J., dissenting) ("[T]he principal of finality promotes important values in our system of jurisprudence."); *Graham v. Billings (In*

---

**10.** The Dinsmore Motion states that after entry of the Distribution Order, an officer of Reorganized TEI deposited $637,149.32 in proceeds from the Second Policy in three installments into Dinsmore's IOLTA account. Dinsmore Motion at 3. Of the funds in its IOLTA account, Dinsmore admits that it was paid $118,300.25 for outstanding bills for legal services owed by Reorganized TEI, while the remaining funds "were disbursed to third parties in accordance with the directions of Dinsmore's client." *Id.* at 4.

re Billings), 94 B.R. 803, 807 (Bankr. E.D.N.Y.1989) ("Judicial finality is a fundamental tenet of our jurisprudence."). Parties are entitled to rely on the finality of court orders, particularly in a bankruptcy context. Indeed, a "bankruptcy court proceeding[ ] [is] a forum where finality of court orders is particularly important." *Lawrence v. Wink (In re Lawrence)*, 293 F.3d 615, 621 (2d Cir.2002) (footnote omitted). *See Corbett v. MacDonald Moving Servs., Inc.*, 124 F.3d 82, 91 (2d Cir.1997) ("[F]inality interests are particularly important in the bankruptcy context, where numerous contending claims and interests are gathered, jostle, and are determined and released."); *Kilbarr Corp. v. Gen. Servs. Admin. (In re Remington Rand Corp.)*, 836 F.2d 825, 833 (3d Cir.1988) (noting that "finality is particularly important in bankruptcy proceedings"); *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3d Cir.1988) ("A strong interest to achieve finality pervades [bankruptcy] arrangements.") (citation omitted); *Grimes v. Multicare AMC, Inc. (In re Genesis Health Ventures, Inc.)*, 280 B.R. 339, 345 (D.Del.2002) ("noting that public policy favor[s] the finality of bankruptcy judgments") (citation omitted); *Palermo v. Pritam Realty, Inc. (In re Pritam Realty, Inc.)*, 233 B.R. 619, 624 (D.P.R.1999) (refusing under 11 U.S.C. § 363(m) "[t]o vacate ... sale at this juncture [as it] would run counter to the essential principle of finality that is particularly important in the bankruptcy context"); *In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 368 n. 24 (E.D.Pa.1996) ("Courts have consistently emphasized the importance of finality in bankruptcy proceedings.") (citations omitted).

By bringing this adversary proceeding, the Trustee turns a blind eye toward these core principles of American jurisprudence and simply ignores the finality of the Dis-

tribution Order. The Trustee mistakenly assumes that the Distribution Order became a legal nullity when the BAP later reversed Chief Judge Waldron's determination that the Petitioning Creditors lacked standing to file an involuntary bankruptcy petition against Reorganized TEI. But the fact that the legal rationale underlying the issuance of the Distribution Order (the Petitioning Creditors' lack of standing to commence an involuntary proceeding) was later adjudged by the BAP to be erroneous does not affect either the validity or finality of the Distribution Order, or the right of third parties—including the Movants—to rely on its express terms.

Because it is axiomatic that parties have a right to rely on the finality of court orders that are not appealed, stayed, or from which relief from judgment is not sought, the Court must accord finality to the Distribution Order. *See In re Acorn Hotels, LLC*, 251 B.R. 696, 701 (Bankr. W.D.Tex.2000) ("[T]he general rule of finality ... normally attaches to judgments from which no timely appeal has been taken.") (citations omitted). *See also Marshall v. Demos (In re Demos)*, 57 F.3d 1037, 1039 (11th Cir.1995) ("To hold [that a party cannot rely on a court order] would be to permit parties the option of deciding which orders to obey, or conversely to condemn parties to the instability of guessing which orders to abide and which to ignore. This will not do."); *Canzano v. Ragosa (In re Colarusso)*, 280 B.R. 548, 559 (Bankr.D.Mass.2002) ("[Creditor's] failure to [object to court order] created a situation wherein the parties to the transaction reasonably relied on the finality of the court's order and this precluded the [creditor] from claiming any right to action subsequent to the court's order.") (citation omitted). Here, it would simply be impractical, imprudent and inequitable to

nullify the Distribution Order by ordering the avoidance and recovery of the Transfers when the parties justifiably relied on a final court order (the Distribution Order) that was not stayed or appealed. *See MacPanel Co. v. Va. Panel Corp.*, 283 F.3d 622, 625 (4th Cir.2002) ("[S]ome controversies are not amenable to judicial resolution, and some grow beyond the remedial powers of a court. This is particularly true when a party, seeking a return to the status quo ante, sits idly by and permits intervening events to extinguish old rights and create new ones.") (citation omitted). By attempting to unwind the Transfers in this adversary proceeding, the Trustee is seeking "a return to the status quo ante." *Id.* He requests this relief on behalf of, among others, the Petitioning Creditors, who, by not appealing or seeking to stay the Distribution Order, "[sat] idly by and permit[ted] intervening events to extinguish [their] rights. . . ." *Id.*

In sum, ordering the avoidance and recovery of the Transfers and turnover of the proceeds of the Second Policy to the Trustee would effectively result in the reversal of the Distribution Order, and affect numerous third parties, including the unnamed John Doe Defendants, who ultimately took receipt of the Transfers. Nullifying the effect of the Distribution Order "not only [would] inequitably affect third parties, but it also [would be] contrary to the public policy of promoting 'the orderly administration of estates by affording finality to the judgments of the bankruptcy court.'" *Lewis Law & Mine Mgmt., Inc. v. Wolfe (In re Mt. Laurel Res. Co.)*, 1999 WL 33542427, at *5 (S.D.W.Va.1999) (quoting *Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco Inc.)*, 92 B.R. 38, 45–46 (S.D.N.Y.1988)).[11]

## C. The Trustee's Claims

### 1. Section 542 Turnover Claim

In his first claim for relief, the Trustee seeks turnover of the proceeds of the Second Policy from the Defendants under § 542 of the Bankruptcy Code. Rieser claims that the proceeds constitute "property of the estate" as defined in § 541 of the Bankruptcy Code. Section 541(a)(1) provides that the "commencement of a case under section 301, 302, or 303 of this title creates an estate . . . . comprised of . . . legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Section 542(a) provides in part that "an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . *shall deliver to the trustee, and account for, such property or the value of such property[.]*" 11 U.S.C. § 542(a) (emphasis added).

"[S]ection 542(a) requires anyone holding property of the estate to deliver it

---

11. At the Hearing, counsel for the Trustee argued that unless the Transfers are subject to avoidance, the Defendants (and, particularly, the Shareholders) will get away with what the Trustee's counsel characterized as a "blatant money grab." Without expressing an opinion about this characterization of the Transfers, the Court notes that Chief Judge Waldron's Distribution Order provided that the proceeds of the Second Policy were to be distributed "in accordance with applicable nonbankruptcy law." Distribution Order (*Troutman I*, Doc. 304; *Troutman II*, Doc. 60; *Harker Proceeding*, Doc. 51). To the extent that there may exist causes of action based on the failure of one or more of the Defendants to distribute the proceeds in accordance with state law, the Trustee remains free to pursue such claims. But the finality principles discussed above dictate that any such claims not depend for their existence upon the premise that the Distribution Order was effectively nullified by the *Second BAP Decision* and the *nunc pro tunc* entry of the Order for Relief— as do all of the claims asserted by the Trustee in this adversary proceeding.

to the trustee." *Foster v. Hill (In re Foster)*, 188 F.3d 1259, 1265 (10th Cir. 1999) (citation omitted). "In order to prevail in a turnover action, the trustee must show: (1) the property sought to be recovered is property of the estate, and (2) the trustee is entitled to use, sell or lease the property pursuant to Section 363 of the Bankruptcy Code." *Tominaga v. Sherwood Invs. Ltd. (In re Tominaga)*, 325 B.R. 653, 658 (Bankr.M.D.Fla.2005) (citing 11 U.S.C. § 542(a)); *Teligent, Inc. v. Mandl (In re Teligent, Inc.)*, 325 B.R. 134, 137 (Bankr. S.D.N.Y.2005) ("Under § 542(a), the trustee may compel the turnover of property of the estate that the trustee can use, sell or lease."). "The crucial first question raised by a turnover motion is whether the property to be turned over is property of the estate." *Lyle v. Santa Clara County Dep't. of Child Support Servs. (In re Lyle)*, 324 B.R. 128, 130 (Bankr.N.D.Cal.2005). *See also In re Mid–Island Hosp.*, 254 B.R. 71, 75 (E.D.N.Y.2000) (finding that funds withheld from Chapter 11 debtor hospital by medical insurer, at the direction of the State of New York, were not "property of the estate," and thus interest on such funds did not constitute proceeds subject to turnover under § 542(a)).

■ The Trustee's turnover claim must fail because the proceeds of the Second Policy were determined by Chief Judge Waldron not to be property of the *Troutman II* bankruptcy estate at the time they were disbursed. The Distribution Order specifically states that the proceeds "are not property of any bankruptcy estate presently within the jurisdiction of this Court." Distribution Order (*Troutman I*, Doc. 304; *Troutman II*, Doc. 60; *Harker Proceeding*, Doc. 51). The Trustee's contention that the *nunc pro tunc* entry of the Order for Relief restored the Court's jurisdiction over the proceeds of the Second Policy is without merit. Rieser

asserts that because the Order for Relief was entered *nunc pro tunc* to October 18, 1999, it became effective before entry of the Distribution Order on March 10, 2000, and thus the proceeds of the Second Policy were in fact property of the estate and subject to the Court's jurisdiction. But a *nunc pro tunc* order cannot undo that which is done or suffice as a jurisdictional grant. *See W.N.J. v. Yocom*, 257 F.3d 1171, 1172 (10th Cir.2001) ("A lack of jurisdiction cannot be corrected by an order *nunc pro tunc* ... the only proper office of a *nunc pro tunc* order is to correct a mistake in the records; it cannot be used to rewrite history.") (citing *Cent. Laborers' Pension, Welfare & Annuity Funds v. Griffee*, 198 F.3d 642, 644 (7th Cir.1999) (internal quotation marks omitted)). "An order may be entered *nunc pro tunc* to make the record speak the truth, but it cannot act as an order which in fact was not previously made." *United States v. AAPC, Inc. (In re AAPC, Inc.)*, 277 B.R. 785, 789 (Bankr.D.Utah 2002) (citing *Crosby v. Mills*, 413 F.2d 1273 (10th Cir.1969)).

The Distribution Order ceded jurisdiction over the proceeds of the Second Policy and authorized their disbursement. The Petitioning Creditors in *Troutman II* did not appeal or seek to stay the Distribution Order or attempt to obtain relief from judgment. For the reasons explained above, the Court concludes that neither the *Second BAP Decision* nor the *nunc pro tunc* entry of the Order for Relief affects the validity or finality of the Distribution Order. The *nunc pro tunc* entry of the Order for Relief simply cannot rewrite history by restoring the status quo ante or nullifying Chief Judge Waldron's determination that proceeds of the Second Policy could be disbursed in accordance with applicable nonbankruptcy law. Because at the time the proceeds were disbursed a judicial determination had been made that the funds were not "property of any bank-

ruptcy estate presently within the jurisdiction of this court," Distribution Order (*Troutman I*, Doc. 304; *Troutman II*, Doc. 60; *Harker Proceeding*, Doc. 51), the turnover claim fails as a matter of law.

## 2. Theft and Conversion

 In his second claim for relief, the Trustee asserts a conversion claim against Dinsmore and Rufus Troutman. Under Ohio law, conversion has been defined as:

a wrongful exercise of dominion over property in exclusion of the right of the owner, or withholding it from his possession under a claim inconsistent with his rights. The elements of a conversion claim are: 1) plaintiff's ownership or right to possession of the property at the time of the conversion; 2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and 3) damages. Further, where the object of conversion has been acquired lawfully, the possessor of such property cannot be held to have converted it or to wrongfully possess it until, upon demand, the possessor fails to restore the object to one who has a right to possess it.

*NPF IV, Inc. v. Transitional Health Servs.*, 922 F.Supp. 77, 80–81 (S.D.Ohio 1996) (citations and internal quotation marks omitted). *See also Neumann v. Neumann (In re Neumann)*, 182 B.R. 502, 505 (Bankr.N.D.Ohio 1995); *Allied Erecting & Dismantling Co., Inc. v. Youngstown*, 151 Ohio App.3d 16, 783 N.E.2d 523, 537 (2002).

 Because the Distribution Order relinquished the Court's jurisdiction over the proceeds of the Second Policy and authorized the Transfers to be made in accordance with nonbankruptcy law, the Trustee's conversion claim also must fail. First, the Trustee cannot establish owner-ship or possession at the time the property was allegedly converted, because he did not have the right to possession of the proceeds of the Second Policy when the Transfers were made. *See NPF IV*, 922 F.Supp. at 80–81. Second, the Trustee does not have a current right to possession of the proceeds because of the finality accorded the Distribution Order. *See id.* Third, by merely taking possession of and transferring the proceeds of the Second Policy, Dinsmore did not engage in a wrongful act, because the Distribution Order expressly authorized these acts. Movants are accordingly entitled to summary judgment on the Trustee's conversion claim.

## 3. Section 549 Postpetition Transfers

In his third claim for relief, the Trustee contends that most of the Transfers consist of unauthorized postpetition transfers made in violation of § 549 of the Bankruptcy Code. Rieser claims that the Transfers "were made after commencement of the case and were not authorized by either the Bankruptcy Code or the Court." Compl. ¶ 66.

 Section 549 provides in relevant part as follows:

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or (B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a). To avoid the Transfers under § 549(a), Rieser must establish the following four elements: "First, the unauthorized transfer must occur after the commencement of the case. Second, prop-

erty of the bankruptcy estate must be involved. Third, the Trustee must show that the Debtor transferred the property. Fourth, the transfer must not be authorized by the court or the Bankruptcy Code." *Cohen v. KDC Fin. Servs., Inc. (In re Miller Mining, Inc.)*, 219 B.R. 219, 221–22 (Bankr.N.D.Ohio 1998) (citing *Gibson v. U.S. (In re Russell)*, 927 F.2d 413, 417–18 (8th Cir.1991)). "A transferee may establish that a transfer is authorized by proffering a court order. . . ." *Langhorne v. Warmus (In re Am. Way Serv. Corp.)*, 229 B.R. 496, 530 (Bankr.S.D.Fla.1999). *See also Hunter v. Socy. Bank & Trust (In re Parker Steel Co.)*, 149 B.R. 834, 856 (Bankr.N.D.Ohio 1992) ("Defendant should be permitted to rely on the post-petition payments, authorized by the cash collateral order, as being final. The court will not, then, avoid these payments.").

■ The Trustee can meet the first element for avoidance under § 549(a)—the Transfers occurred postpetition. The Transfers followed from the entry of the Distribution Order on March 10, 2000, which authorized disbursement of the proceeds of the Second Policy in accordance with applicable nonbankruptcy law, and thus occurred after the effective date of the *nunc pro tunc* Order for Relief—i.e., October 18, 1999.[12] The Trustee fails, however, to establish all of the remaining requirements for avoidance. As set forth above, the Distribution Order specifically recited that the proceeds of the Second Policy were not property of the bankruptcy estate and relinquished jurisdiction over the proceeds. The Transfers, therefore, did not involve property of the bankruptcy estate. *See Miller Mining., Inc.*, 219 B.R. at 221–22. Finally, and most importantly, the Distribution Order clearly authorized

and directed the funds to be distributed in accordance with nonbankruptcy law. Thus, Rieser's contention that the transfers were made without Court authority is simply wrong. Hence, the Trustee's § 549 claim fails as a matter of law.

### 4. Section 548 Fraudulent Transfers

■ In his fourth claim for relief, the Trustee asserts that the Transfers "were made or incurred within one year before the date of filing of the petition" and constitute fraudulent transfers that are avoidable under 11 U.S.C. § 548(a)(1). Section 548(a)(1) of the Code provides:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debt-

---

**12.** As pointed out above, while entry of the Order for Relief *nunc pro tunc* established the filing date for the involuntary petition, it did not negate the effect of the Distribution Order.

or was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1). Section 548(a)(1) expressly states that a trustee may avoid only transfers made by a debtor "within one year before the date of the filing of the petition." *Id. See Consol. Partners Inv. Co. v. Lake*, 152 B.R. 485, 490 (Bankr. N.D.Ohio 1993) ("[A]s expressly contained in the language of § 548, that specific provision addresses fraudulent conveyances only where such transfer occurred on or within one year before the bankruptcy filing. Thus[ ], the objective of § 548 is to avoid certain prepetition transfers—not postpetition transfers."); *Bernstein v. Gailey (In re Gailey, Inc.)*, 119 B.R. 504, 515 (Bankr.W.D.Pa.1990) (holding that Chapter 7 trustee could not recover as fraudulent transfers checks made payable to "cash" that were endorsed by corporate debtor's sole shareholder, where checks were issued postpetition); *Hoffman v. Cheek (In re Meltzer)*, 90 B.R. 21, 25 (D.Conn.1988) (finding that postpetition transfer could not be avoided under § 548, even if consideration were inadequate, because that provision "states the time period within which a transfer must occur if it is to be avoided .... [and][t]hat time period is prior to the filing of the petition").

Here, the Transfers were made after the effective date of the Order for Relief. Because the Transfers were made postpetition, they cannot be avoided as fraudulent transfers under § 548(a)(1).

**5. Section 547 Preferential Transfers**

■ In his fifth claim for relief, the Trustee seeks to avoid as preferential transfers all distributions of the proceeds of the Second Policy to non-insiders made within 90 days prior to the filing of the petition and, all distributions of proceeds to insiders (including the Shareholders), made up to one year prior to the petition date. 11 U.S.C. § 547(b); Compl. ¶ 77. Section 547(b) of the Bankruptcy Code provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b). "[S]ection 547(b) of the Code ... plainly requires [the] transfer to occur pre-petition." *Anderson–Smith & Assocs., Inc. v. Xyplex, Inc. (Matter of Anderson–Smith & Assocs., Inc.)*, 188 B.R. 679, 684 (Bankr.N.D.Ala. 1995). *See also Field v. Fifth Third Bank (In re Nasr)*, 191 B.R. 689, 693 (Bankr. S.D.Ohio 1996) (finding that bank's recordation of lien on title to debtors' vehicle could not be preferential transfer, where

lien was recorded postpetition); *Field v. ITT Fin. Servs. (In re Field),* 113 B.R. 185, 187 (Bankr.W.D.Pa.1990) ("[P]ostpetition payment ... is voidable under § 549 to the extent it is based on a postpetition delivery ... and voidable as a preference under § 547 to the extent it is based on a prepetition delivery.").

The Trustee's preference claim suffers from the same infirmity as his § 548 claim. Because the Transfers were made postpetition, they cannot, as a matter of law, be avoided as preferences under § 547(b) of the Code.

### 6. Ohio UFTA Fraudulent Transfers

In his sixth claim for relief ("UFTA Claim"), the Trustee contends that: (1) the Transfers constitute fraudulent transfers under the Ohio UFTA, which is codified in Chapter 1336 of the Ohio Revised Code; (2) he may avoid the Transfers using the "strong-arm" powers granted him under 11 U.S.C. § 544(a) and (b); and (3) he may recover the Transfers from each of the Defendants under 11 U.S.C. § 550. The Trustee brings his UFTA Claim under Ohio Revised Code §§ 1336.04(A) and 1336.05(A). Ohio Revised Code § 1336.04(A) provides:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Ohio Rev.Code Ann. § 1336.04(A) (West 2004). Ohio Revised Code § 1336.05(A) states:

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Ohio Rev.Code Ann. § 1336.05(A) (West 2004).

Like his § 547 and § 548 claims, Rieser's UFTA Claim also fails as a matter of law because he seeks the avoidance of transfers that were made postpetition. "Section 544 applies to pre-petition transfers of property only." *Farmer v. Autorics, Inc. (In re Branam),* 247 B.R. 440, 444 (Bankr.E.D.Tenn.2000) (collecting cases). *See also 718 Arch St. Assocs. v. Blatstein (In re Blatstein),* 260 B.R. 698, 711 (E.D.Pa.2001) ("[T]he Trustee's strong-arm power under § 544(a) only applies to prepetition transfers.") (collecting cases).

### 7. The Trustee's Claim Based on Ohio Revised Code §§ 1313.56— 1313.58

Again invoking the strong-arm powers granted by § 544, the Trustee con-

tends in his seventh claim for relief that the Transfers may be avoided under Ohio Revised Code §§ 1313.56—1313.58. Although the Trustee's seventh claim for relief references §§ 1313.56, 1313.57 and 1313.58, it is § 1313.56 that establishes a statutory claim for avoidance of conveyances made either with design to prefer or fraudulent intent. *See* Ohio Rev.Code Ann. § 1313.56 (West 2004). Section 1313.57 creates an exception if the party to whom the property has been conveyed was unaware of the transferor's preferential or fraudulent intent. *See* Ohio Rev.Code Ann. § 1313.57 (West 2004). Ohio Revised Code § 1313.58 establishes an enforcement mechanism by giving creditors authority to bring suit. *See* Ohio Rev.Code Ann. § 1313.58 (West 2004). *See also Danis v. Great Am. Ins. Co.,* 159 Ohio App.3d 119, 823 N.E.2d 59, 70 (2004).

■ Ohio Revised Code § 1313.56 provides:

A sale, conveyance, transfer, mortgage, or assignment, made in trust or otherwise by a debtor, and every judgment suffered by him against himself in contemplation of insolvency and with a design to prefer one or more creditors to the exclusion in whole or in part of others, and a sale, conveyance, transfer, mortgage, or assignment made, or judgment procured by him to be rendered, in any manner, with intent to hinder, delay, or defraud creditors, is void as to creditors of such debtor at the suit of any creditor. In a suit brought by a creditor of such debtor for the purpose of declaring such sale void, a receiver may be appointed who shall take charge of all the assets of such debtor, including the property so sold, conveyed, transferred, mortgaged, or assigned, and also administer all the assets of the debtor for the equal benefit of the creditors of the debtor in proportion to the amount of their respective demands, including those which are unmatured.

Ohio Rev.Code Ann. § 1313.56 (West 2004). Although Ohio Revised Code § 1313.56 is often referred to as the "Ohio Preference Statute," *see Roberds v. Broyhill Furniture (In re Roberds),* 313 B.R. 732, 737 (Bankr.S.D.Ohio 2004), "th[e] statute provide[s] two independent causes of action, one based on design to prefer, and one based on fraud." *Congrove v. McDonalds Corp. (In re Congrove),* 330 B.R. 880, 2005 WL 2089856, at *9 (6th Cir. BAP 2005).

■ The Trustee's claim based on Ohio Revised Code § 1313.56 is fatally flawed for two reasons. First, as noted above, a trustee's § 544 avoiding powers extend only to prepetition transfers. *Blatstein,* 260 B.R. at 711; *Branam,* 247 B.R. at 444. Second, as Chief Judge Waldron noted in *Roberds:*

[T]he Supreme Court of Ohio [has] held that the language enacted by the Ohio General Assembly [in the predecessor version of Ohio Revised Code § 1313.56] was not intended to allow recovery of any ... preferential transfer if the payment was in money. *Nat'l Bank of Commerce v. Gettinger,* 68 Ohio St. 389, 67 N.E. 739 (1903), syllabus. Since those dates, the Supreme Court of Ohio has never overruled its holding and the Ohio General Assembly, despite multiple reenactments of the statute, has never altered the relevant language.

*Roberds,* 313 B.R. at 737–45. Because the Transfers were made postpetition, and thus not subject to avoidance under § 544 of the Code, and because Ohio Revised Code § 1313.56 does not provide a basis for the avoidance and recovery of monetary transfers, Movants are entitled to summary judgment on the Trustee's seventh claim for relief.

### 8. Excessive Legal Fees

 In his eighth claim for relief, Rieser seeks a finding under 11 U.S.C. § 329 that Dinsmore charged Reorganized TEI excessive legal fees. Rieser asks that Dinsmore be forced to repay the amount of legal fees deemed to be excessive. Dinsmore counters by pointing out that it received payment of its legal fees from the proceeds of the Second Policy, which were disbursed after entry of the Distribution Order.

Section 329 of the Code provides:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—

(1) the estate, if the property transferred—

(A) would have been property of the estate; or

(B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or

(2) the entity that made such payment.

11 U.S.C. § 329(a). The Trustee's claim based on § 329(a) must fail because the statute comes into play only where the payment or agreement in question was made "after one year before the date of the filing of the petition[.]" 11 U.S.C. § 329(a). In this case, the payments to Dinsmore were made after the proceeds of the Second Policy became available for distribution—i.e., following entry of the Distribution Order. Because the *nunc pro tunc* entry of the Order for Relief established the petition date in Reorganized TEI's bankruptcy case as October 18, 1999, the payments in question were made postpetition, not during the one-year period prior to the petition date.

More fundamentally, it would be unfair to subject Dinsmore to the requirements of either § 329 or § 330[13] of the Code given the procedural history of the *Troutman I* and *Troutman II* bankruptcy cases. At the time Dinsmore rendered legal services to Reorganized TEI, a judicial determination had been made by Chief Judge Waldron that neither Reorganized TEI nor the proceeds of the Second Policy were subject to the jurisdiction of the bankruptcy court. By now asserting that the *nunc pro tunc* entry of the Order for Relief retroactively subjected Dinsmore to the Code's requirements governing retention and compensation of professionals, the Trustee is again attempting to rewrite history.

For these reasons, the Trustee's § 329(a) claim for recovery of attorney fees from Dinsmore fails as a matter of law.

### 9. Remaining Claims

In his ninth through eleventh claims, Rieser seeks relief that may be awarded

---

**13.** Section 330(a)(1) of the Bankruptcy Code limits the payment of compensation from a bankruptcy estate to those professional persons employed under Code §§ 327 or 1103 and provides that only "reasonable compensation for actual necessary services" may be awarded. 11 U.S.C. § 330(a)(1).

 

only if he is successful on one of his underlying claims. The Trustee's first eight claims have failed to survive summary judgment; thus, Movants are entitled to summary judgment on the remaining three claims.

In his ninth claim, Rieser seeks to bar the Defendants from filing any proofs of claim in the *Troutman II* case. Because the Court has determined—based on the finality accorded the Distribution Order—that the proceeds of the Second Policy are not property of the estate of *Troutman II* and the Transfers are not avoidable, no new funds will flow into the *Troutman II* estate, and the Defendants will not be filing proofs of claim in the underlying bankruptcy case. *See* 11 U.S.C. § 502(h).

In the tenth claim for relief, the Trustee seeks an accounting, imposition or declaration of a trust, and disgorgement of property from the Defendants. Again, because the Movants are entitled to summary judgment on the Trustee's first eight claims for relief, this claim also fails as a matter of law.

 Finally, in his eleventh claim for relief, the Trustee seeks recovery of costs and attorney fees. Rieser cannot recover his costs because he has not prevailed in this adversary proceeding. Only a "prevailing party" can recover costs under Fed. R. Bankr.P. 7054(b). Rieser has not prevailed on any of the claims asserted in the Complaint. Nor has he identified other grounds entitling him to an award of fees.

## V. Conclusion

For these reasons, the Court **GRANTS** the Movants' respective motions for summary judgment and **DISMISSES** all claims for relief brought by the Trustee against the Movants. A separate judgment will be entered.

**IT IS SO ORDERED.**